# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔉𝔬𝔲𝔯𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

ABIMBOLA AJAYI, a/k/a Abbi Ajayi,
ABIODUN OGUNWALE, a/k/a Abbey Ogunwale,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA, IN CASE
NOS. 1:24-cr-00165-MSN-2 AND 1:24-cr-00165-MSN-1, HONORABLE
MICHAEL STEFAN NACHMANOFF, U.S. DISTRICT COURT JUDGE

## OPENING BRIEF OF APPELLANTS

LAUREN N. BEEBE
  *Assistant United States Attorney*
DANIEL J. HONOLD
  *Assistant United States Attorney*
KATHLEEN E. ROBESON
  *Assistant United States Attorney*
KIMBERLY M. SHARTAR
  *Assistant United States Attorney*
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
lauren.beebe@usdoj.gov
daniel.honold@usdoj.gov
kathleen.robeson@usdoj.gov
kimberly.m.shartar@usdoj.gov

*Attorneys for Plaintiff-Appellee*

JONATHAN M. KNOWLES
BURNHAM & GOROKHOV, PLLC
1634 I Street, NW, Suite 575
Washington, DC 20006
(347) 273-1828
jonathan@burnhamgorokhov.com

*Attorney for Defendant-Appellant
  Abimbola Ajayi*

CHRISTOPHER LEIBIG
LAW OFFICE OF
  CHRISTOPHER LEIBIG
421 King Street, Suite 505
Alexandria, Virginia 22314
(703) 683-4310
chris@chrisleibiglaw.com

*Attorney for Defendant-Appellant
  Abiodun Ogunwale*

CP COUNSEL PRESS   (800) 4-APPEAL • (131854)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... v

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

STATEMENT OF THE CASE ................................................................. 2

    FACTUAL BACKGROUND ................................................................ 2

    INVESTIGATION AND INDICTMENT ............................................... 3

    PRE-TRIAL MOTIONS ..................................................................... 5

    TRIAL ........................................................................................ 10

    POST-TRIAL PROCEEDINGS ......................................................... 12

SUMMARY OF ARGUMENT ............................................................... 13

ARGUMENT ..................................................................................... 18

I.    THE DISTRICT COURT ERRED IN DENYING
      DEFENDANTS' FREQUENT REQUESTS TO
      OBTAIN CRITICAL EVIDENCE FROM
      PROJECT HOPE ...................................................................... 18

    A.    Standard of Review ....................................................... 19

    B.    *United States v. Nixon* Does Not Set the
        Applicable Standard for a Defendant's
        Subpoena to a Third Party. *Nixon* Measured a
        Subpoena by the Prosecution, Not the Defense,
        Against a Standard That Was Not Intended for
        Subpoenas to Third Parties.  Under These
        Circumstances, Broader Discovery Is
        Constitutionally Required ............................................ 20

    C.    Even Under the *Nixon* Standard, Defendants
        Were Entitled to the Documents Requested ............... 23

1.  The Requested Evidence Was Specific and Material to Preparing Defendants' Rebuttal: the Government's Case Did Not Prove a Fraud.......................................................25

2.  Defendants Were Wrongly Precluded from Using Compulsory Process to Obtain Evidence Showing Project HOPE's Own Dishonesty...........................................................30

    a.  Records of Project HOPE's Misdeeds Were Critical to Prove Its Bias and Its Motive to Hide Project HOPE's Own Malfeasance by Scapegoating Defendants.................................................30

    b.  Defendants' Intended Uses of the Material Is Not Entirely Impeachment. Regardless, Defendants Can Use a Rule 17 Third-Party SDT to Obtain Material Impeachment Evidence.............................32

3.  Many of the Requested Records Were Material Not Only to the Trial But Also to Ogunwale's Sentencing. He Should Have Been Able to Subpoena, for Presentation at Sentencing, Records of his Positive Contributions to Project HOPE and Its Constituents.......................................................35

D.  The District Court Erred by Denying a Request to Issue the SDT for *In Camera* Review, and to Preserve the Appellate Record ...................................38

II. THE COURT SHOULD HAVE GRANTED DEFENDANTS' MOTION TO SUPPRESS EVIDENCE DERIVED FROM WARRANTS FOR THE ENTIRETY OF THEIR GOOGLE ACCOUNTS, FROM SEVERAL YEARS BEFORE AND AFTER THE SUSPECTED CONSPIRACY.......................................39

A.    The Court Should Review the Motion *De Novo* ........... 40

B.    The Unnecessary Breadth of the Warrant Violates the Fourth Amendment ................................. 40

    1.    The Warrant Sought Far-Reaching – and Often Deeply Personal – Records of Defendants' Lives with No Connection to the Alleged Conspiracy. Such a General Request Violates the Fourth Amendment .......... 44

        a.    A Warrant to Search an Entire Google Account Is Overbroad and Insufficiently Particular When Probable Cause Is Limited to Parts of the Account and Law Enforcement Can Request a More Targeted Search ........................................................ 44

        b.    *United States v. Zelaya-Veliz* Is Not to the Contrary. Circumstances Permitted a Far Narrower Search and Seizure Than Was Possible in Zelaya-Veliz, and the Intensely Private Nature of the Contents Warranted Greater Protection .................. 49

    2.    The Fourth Amendment Requires that Searches Be Confined to the Relevant Time Period. Yet, the Warrant Required Disclosure of Materials from Years Before Defendants' Role in the Alleged Conspiracy and Years After that Conspiracy Had Terminated ............................. 53

C.    The Good Faith Exception Does Not Apply to an Unjustified Search of An Entire Google Account Sought on the Basis of an Inapposite Template .......... 56

　　　　　1.　The Warrant Here Was Significantly Broader than the Warrant Upheld in *Zelaya-Veliz*, Seeking More Extensive Materials Without a Comparable Justification ....................................... 57

　　　　　2.　The Warrant Issued Years Later than the Warrant in *Zelaya-Veliz*, After Courts Nationwide Had Made Clear the Need for Greater Specificity When Possible ..................... 58

III.　THE COURT SHOULD NOT HAVE ADMITTED AJAYI'S BANK RECORDS, WHICH REVEALED YEARS OF LOCATION DATA AND WERE OBTAINED WITHOUT A WARRANT ................................ 61

　　A.　The Court Should Review the Motion *De Novo* ........... 62

　　B.　Under the Fourth Amendment, A Warrant Is Required to Obtain Records of Ajayi's Physical Location over Several Years. The Supreme Court Has Never Applied the Third-Party Doctrine to Location Data. Moreover, Any Such Application Would Be Untenable in Light of Recent Supreme Court Authority ............................... 62

　　C.　Introduction of the Bank Records at Trial, Including to Prove Ms. Ajayi's Location, was Prejudicial to Both Defendants ................................... 66

CONCLUSION ....................................................................... 67

REQUEST FOR ORAL ARGUMENT .................................... 67

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bowman Dairy Co. v. United States,*
341 U.S. 215 (1951) ................................................................ 24, 33

*Burns v. United States,*
235 A.3d 758 (D.C. 2020) ........................................... *passim*

*California v. Trombetta,*
467 U.S. 479 (1984) ................................................................ 22, 23

*Carpenter v. United States,*
585 U.S. 296 (2018) ................................................... *passim*

*Crawford v. Washington,*
541 U.S. 36 (2004) .......................................................... 23

*In re [Redacted]@gmail.com,*
62 F. Supp. 3d 1100 (N.D. Cal. 2014) .................... 51, 54, 59

*In re Grand Jury Subpoena,*
829 F.2d 1291 (4th Cir. 1987) ............................... 19

*In re K.K.,*
756 F.3d 1169 (9th Cir. 2014) ............................... 25

*In re Martin Marietta Corp.,*
856 F.2d 619 (4th Cir. 1988) .................................. *passim*

*In re Search of Facebook Account Identified by the Username
Aaron.Alexis,*
21 F. Supp. 3d 1 (D.D.C. 2013) ............................... 46, 51, 59

*In re Search of Google Email Accounts,*
92 F. Supp. 3d 944 (D. Alaska 2015) ....................... 41, 52

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
2 F.4th 330 (4th Cir. 2021) ............................... 17, 59, 62, 63

*Love v. Johnson,*
57 F.3d 1305 (4th Cir. 1995) .............................. 38

*Lyles v. United States*,
910 F.3d 787 (4th Cir. 2018)..........................................57-58

*Michigan v. Harvey*,
494 U.S. 344 (1990)...................................................22, 25

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987)....................................................23, 38

*People v. Carson*,
— N.W.3d. —, No. 166923, 2025 WL 2177501
(Mich. July 31, 2025) ...................................41-42, 47-48, 54

*Powell v. Alabama*,
287 U.S. 45 (1932)........................................................22

*Riley v. California*,
573 U.S. 373 (2014)...................................................41, 61

*Smith v. Bank of America, N.A.*,
443 F. App'x 808 (4th Cir. 2011).........................................34

*Smith v. Maryland*,
442 U.S. 735 (1979)......................................................65

*State v. McLawhorn*,
636 S.W.3d 210 (Tenn. Crim. App. 2020) .................................60

*State v. Melssen*,
2025 WI App 76, — N.W.3d —, (Nov. 20, 2025)...........................48, 49

*Taylor v. State*,
260 A.3d 602 (Del. 2021)..................................................60

*Terreros v. State*,
312 A.3d 651 (Del. 2024)..................................................43

*United States v. Alford*,
744 F. App'x 650 (11th Cir. 2018)......................................15, 50

*United States v. Bajakajian*,
524 U.S. 321 (1998)......................................................19

*United States v. Blake*,
868 F.3d 960 (11th Cir. 2017) ...........................42, 43, 47, 51

*United States v. Burkhow,*
   No. 19-CR-59-CJW-MAR, 2020 WL 589536
   (N.D. Iowa Feb. 6, 2020) ............................................................ 46, 60

*United States v. Caro,*
   597 F.3d 608 (4th Cir. 2010) .............................................................. 29

*United States v. Carter,*
   15 F.R.D. 367 (D.D.C. 1954) .............................................................. 35

*United States v. Chatrie,*
   136 F.4th 100 (4th Cir. 2025), *cert. granted,*
   No. 25-112 (U.S. Jan. 16, 2026) ............................................ 62, 65, 66

*United States v. Cuthbertson,*
   651 F.2d 189 (3d Cir. 1981) ............................................................... 35

*United States v. Doyle,*
   650 F.3d 460 (4th Cir. 2011) ......................................... 40, 45, 60, 62

*United States v. Ford,*
   184 F.3d 566 (6th Cir. 1999) .............................................................. 54

*United States v. Fowler,*
   932 F.2d 306 (4th Cir. 1991) .............................................................. 19

*United States v. Griffith,*
   867 F.3d 1265 (D.C Cir. 2017) .......................................................... 58

*United States v. Hamilton,*
   No. 6:18-CR-57-REW-10, 2019 WL 4455997
   (E.D Ky. Aug. 30, 2019) ............................................................ 46, 60

*United States v. Iozia,*
   13 F.R.D. 335 (S.D.N.Y. 1952) ................................................... 21, 22

*United States v. Jones,*
   565 U.S. 400 (2012) ..................................................................... 63, 65

*United States v. Lazar,*
   604 F.3d 230 (6th Cir. 2010) .............................................................. 54

*United States v. Lofstead,*
   574 F. Supp. 3d 831 (D. Nev. 2021), *appeal dismissed,*
   No. 21-10375 (9th Cir. Jan. 4, 2022) ...................................... *passim*

*United States v. Mercery,*
591 F. Supp. 3d 1369 (M.D. Ga. 2022) ...................................... *passim*

*United States v. Miller,*
425 U.S. 435 (1976) .................................................................. 64, 65

*United States v. Moore,*
484 F. App'x 758 (4th Cir. 2012) .............................................. 34, 35

*United States v. Nixon,*
418 U.S. 683 (1974) .............................................................. *passim*

*United States v. Oglesby,*
No. 4:18-CR-0626, 2019 WL 1877228 (S.D. Tex. Apr. 26, 2019) ....... 56

*United States v. Opoku,*
556 F. Supp. 3d 633 (S.D. Tex. 2021) ......................................... 47, 60

*United States v. Parker,*
790 F.3d 550 (4th Cir. 2015) ............................................................ 34

*United States v. Rajaratnam,*
753 F. Supp. 2d 317 (S.D.N.Y. 2011) ............................................... 21

*United States v. Rand,*
835 F.3d 451 (4th Cir. 2016) ............................................................ 20

*United States v. Ray,*
141 F.4th 129 (4th Cir. 2025) ......................................................... 40

*United States v. Richardson,*
607 F.3d 357 (4th Cir. 2010) ...................................................... 19, 30

*United States v. Rondeau,*
No. 4:23-CR-40004-KES, 2024 WL 4765007
(D.S.D. Nov. 13, 2024) ............................................................... 41, 45

*United States v. Shipp,*
392 F. Supp. 3d 300 (E.D.N.Y. 2019) ....................................... *passim*

*United States v. Smith,*
110 F.4th 817 (5th Cir. 2024), *cert. denied,*
146 S. Ct. 356 (2025) ................................................................. 62-63

*United States v. Sterling,*
283 F.3d 216 (4th Cir. 2002)........................................... 40

*United States v. Tucker,*
249 F.R.D. 58 (S.D.N.Y. 2008) ........................................ 21

*United States v. Tyson,*
781 F. Supp. 3d 483 (E.D. Va. 2025) .................... 15, 16, 45

*United States v. Valenzuela-Bernal,*
458 U.S. 858 (1982)......................................................... 23

*United States v. Winn,*
79 F. Supp. 3d 904 (S.D. Ill.) ............................... 43, 54, 56

*United States v. Zelaya-Veliz,*
94 F.4th 321 (4th Cir.), *cert denied,* 145 S. Ct. 571 (2024) ........ *passim*

*Wheeler v. State,*
135 A.3d 282 (Del. 2016)........................................... 41, 50

*Zurcher v. Stanford Daily,*
436 U.S. 547 (1978)......................................................... 45

## Statutes and Other Authorities:

U.S. Const. amend. IV....................................................... *passim*

U.S. Const. amend. V ............................................................ 19

U.S. Const. amend. VI............................................ 19, 20, 22, 33

U.S. Const. art. VI, cl. 2 ....................................................... 23

28 U.S.C. § 1291 .................................................................... 1

28 U.S.C. § 2072(b) .............................................................. 23

Fed. R. App. P. 4(b)(1)(A) ..................................................... 1

Fed. R. App. P. 4(b)(2) ........................................................... 1

Fed. R. App. P. 32(f) ............................................................ 69

Fed. R. Crim. P. 17 .......................................................... 8, 32

Fed. R. Crim. P. 17(c) .................................................... *passim*

Fed. R. Evid. 404 ................................................................ 37

Fed. R. Evid. 405 ................................................................ 37

*First U.S. ATM Opens for Business*,
   History.com, https://www.history.com/this-day-in-
   history/september-2/first-atm-opens-for-business ............................ 65

Sean H. Vanatta, *Credit Card Nation*, Aeon (Apr. 22, 2024),
   https://aeon.co/essays/how-did-america-become-the-nation-of-
   credit-cards ................................................................ 64

Kevin Wack & Alan Kline, *The Evolution of the ATM*,
   American Banker (May 23, 2017), www.americanbanker.com/
   slideshow/the-evolution-of-the-atm .......................................... 65

## INTRODUCTION

This case represents a sharp disparity in the parties' ability to obtain evidence. Defendants were unable to seek privately-held documents that went to the heart of the government's case, despite warranting a subpoena under any standard. By contrast, the government can demand of Defendants' entire lives. It did so, in unnecessary detail, without meeting its obligations under the Fourth Amendment. Faced with such a double standard, any person would appear to be guilty. The Court should reverse their convictions and remand for a fair trial.

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment by the United States District Court for the Eastern District of Virginia. Judgment was imposed on September 5, 2025, against Ajayi, who filed a notice of appeal on September 16, 2025. JA2498-2504, JA2518-2519. Judgment was imposed on September 11, 2025, against Ogunwale, who filed a notice of appeal on September 22, 2025. JA2511-JA2517, JA2520-JA2522. Therefore, the Court has jurisdiction. 28 U.S.C. § 1291; *see* Fed. R. App. Proc. 4(b)(1)(A), 4(b)(2).

## STATEMENT OF ISSUES:

The issues presented are whether the district court erred:

1. in denying Defendants' requests for subpoenas *duces tecum* (SDTs) to Project HOPE.

2. in denying Defendants' motion to suppress the evidence seized from their Google accounts.

3. in denying Defendants' motion to suppress the evidence seized from Ajayi's bank account.

## STATEMENT OF THE CASE

## FACTUAL BACKGROUND

Defendant Abiodun Ogunwale served as the director of business development at Project HOPE, an international organization based in Washington, DC. JA1511, JA1526. As the director of business development, Ogunwale was tasked with identifying opportunities for grant funding, often from USAID, and to place Project HOPE in position to make a competitive bid. This work was referred to as "pre-positioning" or "capture" work. To accomplish this goal, Ogunwale was authorized to hire outside contractors at his discretion. JA1528. These contractors would often be people who lived in, or had close ties to, the

country targeted for a potential project. After a contractor completed his or her task, Ogunwale had the authority to approve that contractor's invoice, which was then paid by Project HOPE. JA1552-1554. Among the contractors hired were Damilola Adeoye and Defendant Abimbola Ajayi.

## INVESTIGATION AND INDICTMENT

In June 2020, Project HOPE reported suspicions of fraud to USAID OIG. JA2626. That August, Ogunwale left Project HOPE. JA1101; *see* JA2626.

On or about March 22, 2021, the government served on Ajayi's bank a grand jury subpoena for all of her records since August 2016. JA2591-2594. The government received the requested records.

In May 2022, the government applied for a warrant to search specified Google accounts. JA2613-2661. Several of these accounts belonged to Ogunwale or Ajayi, who were identified by name. JA2623, JA2627, JA2634-2635, JA2640-2643. The application requested disclosure of a wide range of documents and data – including "all other data" – for all services used by the account holder, from November 1, 2014, until the "present day." JA2615-2618, JA2654-2657. Those

services included numerous communication features, social networking, photos, videos, internet searches, internet history, calendars, contacts, electronic documents, cloud storage, maps, advertising history, applications, smartphone support, and location information. JA2615-JA2616, JA2654-2655. The stated justification for the search was the possible use of emails in planning and executing the purported scheme. JA2630-2644. According to the affidavit, the earliest fraudulent email was sent on July 21, 2015. JA2634. Ajayi's relationship with Project HOPE did not begin until August 2016, and the earliest invoice attributed to her was dated September 1. JA2639, JA2642. The alleged scheme was uncovered in June 2020 and Ogunwale was terminated soon afterwards.[1] JA2626. A "Background Concerning Google's Accounts" section generally suggested that Google account data could be used to identify the account's owner. JA2644-2650. The warrant was issued on May 13, 2022. JA2602-2612. The government received the requested records. *See* JA2662-2704 (excerpt from hundreds of pages of returns).

---

[1] There is a factual dispute, not reflected in the affidavit, about the nature of Mr. Oguwale's departure from Project HOPE.

The grand jury indicted both Defendants for conspiracy to commit mail and wire fraud, and for conspiracy to commit money laundering. JA40-43, JA217-219. It also indicted Ogunwale for mail fraud. JA50, JA216.

## PRE-TRIAL MOTIONS

On January 10, 2025, Ogunwale moved for a Rule 17 subpoena to Project Hope. JA 49-65. He requested fifty-seven items – including his entire employment file – relating to his performance, his official duties and authority, his record of successful grants, Project HOPE's knowledge of fraud and anti-fraud procedures, pre-positioning or capture work, and specific projects on which Ogunwale had worked. JA49-57. During the briefing, Ogunwale argued that the standard set forth in *United States v. Nixon,* 418 U.S. 683 (1974), was inapplicable to requests to third parties and wrongly decided as applied to such requests, especially insofar as it had been misinterpreted to require that requested documents be admissible and to bar the defense from seeking materials for use as impeachment. JA161-65.

On January 10, 2025, Ajayi moved to suppress the admission of her bank records on the grounds that they had been obtained through a

warrantless request for location data, in violation of the Fourth Amendment. JA66-72. Ajayi also moved to suppress the evidence seized from her Google account on the grounds that the warrant was overbroad and lacked particularity. JA74-115. The motion argued that the warrant permitted the government to search, in effect, all of her digital data – equivalent to a search of an entire computer or cell phone – without probable cause. JA74-77, JA78-79, JA98-115. Much of that information was extremely personal. JA102-108; *see* JA2662-2704 (excerpts from hundreds of pages returned). Furthermore, the warrant sought data from years before Ajayi allegedly joined the conspiracy and for years after her last involvement. JA77-78, JA98-115. Ogunwale joined both motions. JA47.

On February 6, 2025, the district court held a hearing on the motions. It denied the motion to suppress financial records on the basis of Supreme Court and Fourth Circuit precedent. JA622-624. It conceded that the warrant for the Google records was broad but denied the motion to suppress those records, finding the warrant sufficiently specific and reasonable in light of the two-step review process, and finding that the time frame was neither unbounded nor unreasonable.

JA637; *see* JA624-637 (argument on the motion). The district court also found that the good faith analysis (sic) applied. JA 637.

In hearing the motion for subpoena, the district court found its mandate limited as to the applicability of *Nixon*. JA638. Ogunwale further justified his requests. JA643-654. The Court denied all but one of Ogunwale' s subpoena requests, despite Ogunwale's proffer that the records would cast doubt on the government's theory of the case and aid him at a potential sentencing. The district court also declined to make the sought materials part of the appellate record under seal, as specifically requested by defense counsel to preclude any argument that prejudice was speculative. JA661.

Following the denial of the motion for subpoenas, Defendants made good faith efforts to request documents from Project HOPE. Project HOPE, however, did not comply. For example, when Ogunwale requested his employment file, Project HOPE produced noticeably incomplete documentation. JA687-688. Project HOPE also did not produce the filing cabinet contained in Ogunwale's office, and refused to explain what had happened to it. JA688-689.

On February 25, 2025, Ogunwale again moved for a Rule 17 subpoena. He repeated his requests for employment documents, sample invoices, evidence of fraud or misconduct, and pre-positioning or capture documents. JA222-226, JA280-284. Ogunwale later expanded the motion to include his filing cabinet and documentation relating to the loss of that filing cabinet. JA229-232, JA284-285. Ajayi adopted his motion. JA302.

At the hearing on March 27, 2025, Ogunwale repeated his justification for the items sought. JA683-684, JA686-687, JA689-691, JA686-697. He also explained that Project HOPE's noncompliance with informal discovery necessitated a subpoena. JA687-689. The district court denied the requests, but "grant[ed] the very narrow relief" of issuing a subpoena for documentation relating to the invoices on which the government intended to rely. JA705.

Ogunwale filed his third motion on April 1, 2025. JA308-316. The motion "reassert[ed] and [did] not waive [Ogunwale's] arguments from his first and second motions . . . ." JA309. Nevertheless, Ogunwale identified 30 requested proposals. JA310-315. The district court issued a subpoena for the agreed-upon documents. JA318-329. Ultimately,

Project HOPE provided only 15 of the 30 proposals requested. JA378-387, JA717.

As a result, on May 2, 2025, Ogunwale filed a fourth motion for a SDT. JA429-433. The motion renewed his request for five business development invoices not alleged to be fraudulent (i.e., during Ogunwale' s tenure). JA430.[2] It specifically stated that if the documents could not be produced, a statement explaining why would be a sufficient response. JA429-430. The district court denied the motion "for the same reasons that the Court articulated they were deficient when originally raised, and . . . to be able to continue to have this trial on Monday." JA796-797; *see* JA796-802 (full argument).

Because the Court refused to have the records placed under seal for the purposes of appeal, the requested materials are not part of the record.

---

[2] Mr. Ogunwale also requested all pre-positioning documents during his tenure, JA430, but withdrew the request in light of a stipulation that such documents were not necessarily kept. JA797-798. Mr. Neri's and Ms. Brye's trial testimony, which Defendants could not have anticipated, suggests that the documents were kept. *See* JA898, JA926-927; JA984-990.

## TRIAL

At trial, the Government called nine witnesses, including seven current or former Project HOPE employees. JA946, JA957, JA1027, JA1509, JA1586, JA1686, JA1769. These witnesses testified that they did not know Adeoye or Ajayi, that they believed others to have performed the work on those contractors' invoices, and that Project HOPE's internal documentation did not reflect that those contractors had performed the work. Nevertheless, these witnesses' admissions provided ample reason to believe that those contractors might have performed work that the witnesses did not know about, which may not have been reflected in documentation, and that Ogunwale could not unilaterally divert money from the organization. JA1935-37 (explaining the significance of trial testimony);[3] *see* JA1325-35. Indeed, one witness admitted that during Ogunwale's tenure, Project HOPE's "profile . . . enhanced quite a bit." JA1731.

---

[3]    The testimony is, in the order cited:  JA1575-1576; JA1677; JA1219-1220; JA1621-1622; JA1675; JA1683; JA1728-1729, JA1762; JA1734-1736; JA898, JA919-920; JA1061; JA1762-1763; JA959; JA1219, JA1251; JA1758; JA1763; JA1569-1570; JA1576-1577; JA1673-1674; JA1762, JA1764; JA945; JA993; JA1053, JA1068-1069, JA1070; JA1217, JA1219; JA1332-1333; JA1217-1219; JA1320.

One Project HOPE witness, Laura Brye, testified that she knew where all proposals were kept: on a shared drive, organized by year. JA984-985. She had found all of those she had been directed to look for, which had only been 15 (or "20, maybe"). JA988-990. Another, Steven Neri, testified that he would have been able to find pre-positioning materials on the electronic filing system. JA898, JA926-997.

The government introduced numerous emails between Defendants, which had been seized from their Google accounts. *See* JA1123-1125, 1129-1140, JA1144-1159. The government contended that these emails proved that the invoices that Ajayi submitted to Project HOPE had been sent to her by Ogunwale. *E.g.* JA1158.

The government introduced the substance of Ajayi's bank records to show that Ajayi also made various deposits to Ogunwale's bank account right after she received payments from Project HOPE. JA1197-1208, JA2053-2054. The government also introduced a bank statement to demonstrate Ajayi's location, specifically, to argue that she was in the United States when she claimed to be in Nigeria. JA1140-1143. In turn, the defense introduced testimony that Ajayi's payments to Ogunwale – and *vice versa* – may have been repayment of a debt, or a

way to avoid paying international wire or currency exchange fees. JA1824-1826, JA1832-1834, JA1249-1250; *see also* JA1219, JA1851-1852 (government was not able to obtain bank records from Nigeria).

The government presented evidence that Ogunwale formed a company called "Compass," which it contended fraudulently billed Project HOPE, and that Ogunwale used a Project HOPE American Express to make allegedly fraudulent purchases. JA1320, 1614-1615, 1667, 1700.

In its closing argument, the government argued that no documentation supported the notion that Ajayi or Adeoye performed the invoiced work, that the work they claimed to perform would have been backed up by a tangible work product had it been done, that no one but Ogunwale had knowledge of how Ogunwale used contractors and approved their invoices, and that all of the Compass invoices were false. JA1309-1310, JA1314, JA1318. In doing so, it frequently referred to Defendant's emails and bank records. JA1309-1312, 1318, 1319.

## POST-TRIAL PROCEEDINGS

Defendants moved for a new trial. JA1912-1939. As relevant here, on reply, Defendants submitted recently-identified indicia that Project

HOPE had manufactured evidence: the performance reviews that it had produced referred to Project HOPE staff members who had not been employed at the date of the supposed review. JA2058-2059; *see* JA2080-2150. Upon inquiry by the government, Project HOPE explained that it had not actually produced documentation from the time, but had created new documents purportedly using the contents of the contemporaneous performance reviews. JA2157-2159, JA2164-2166.

On September 5, 2025, the district court sentenced Ajayi to 12 months and 1 day of imprisonment, followed by 2 years of supervised release. JA2497, 2511-2512. On September 11, 2025, the district court sentenced Ogunwale to 42 months of imprisonment, followed by 3 years of supervised release. JA2498-2499, JA2504-2505.

## SUMMARY OF ARGUMENT

The district court should have granted Defendants' motions for subpoenas to Project HOPE, which sought documents essential to the defense. Throughout the trial and in closing argument, the defense attempted to point out that (1) any vagueness or inaccuracies in the invoices were not indicative of an intent to defraud because such invoices were consistent with how Project HOPE always did business;

(2) that "pre-positioning" work – that is, all of the work proceeding the actual creation of a proposal – was often undocumented; (3) that Project HOPE was aware of how Ogunwale did business and consented to it; and (4) that Ogunwale was part of the team which worked on any bid proposal which came from his "pre-positioning" work even if he did not appear on the official "checklist" of who worked on the bid proposal. These documents would prove that the contractors performed the work for which they were paid, or that Project HOPE knew the nature of the payments to them, in which case the payments were not fraud. Project HOPE documents also could have revealed Project HOPE's motivation to exculpate itself by placing the blame on Ogunwale, and even that Project HOPE had withheld documents in the hope of doing that. *See In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988) (affirming issuance of a subpoena "for a defense that [the defendant's employer] hung him out to dry while protecting its own interest").

The *Nixon* standard does not apply to a defendant's subpoenas to a third party. *See United States v. Nixon,* 418 U.S. 683, 699 n.12 (1974). Even if it did, however, the Defendants' motions satisfied it. Defendants made requests for specific documents, which they knew to exist, that

Defendants could have introduced at trial and Defendants could not obtain any other way. This was more than sufficient to justify issuance of a subpoena. *Martin Marietta Corp.*, 856 F.2d at 622. A denial of a subpoena under these circumstances undermined Defendants' constitutional rights to preparation of a defense, due process of law, and compulsory process.

The district court also should have granted Defendants' motion to suppress the Google evidence. To satisfy both the probable cause and particularity requirements of the Fourth Amendment, a warrant must be as specific as possible under the circumstances. *See United States v. Zelaya-Veliz*, 94 F.4th 321, 337 (4th Cir.) ("Because the particularity requirement is a pragmatic one, the degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." (cleaned up)), *cert denied*, 145 S. Ct. 571 (2024); *United States v. Tyson*, 781 F. Supp. 3d 483, 504 (E.D. Va. 2025) (finding warrant invalid when "it would have been both practical and prudent for the detectives to limit their search into Tyson's phone."); *cf. United States v. Alford*, 744 F. App'x 650, 653 (11th Cir. 2018) (upholding warrant that "was as specific as the

circumstances and nature of the activity under investigation permitted").

The warrant to search Defendants' Google accounts permitted search of the entire accounts, from 2014 until 2022, even though the affidavit only provided probable cause to search emails for a much shorter time. The scope of the search may not exceed that supported by probable cause. *See, e.g.*, *Tyson*, 781 F. Supp. 3d at 501 ("The authorization to search all the devices for all their data is not properly tethered to the offense for which there was probable cause."); *cf. Zelaya-Veliz*, 94 F.4th at 338-39 (finding breadth of warrant justified by the "sheer magnitude" of a "wide-ranging" violent conspiracy between "a host of gang-affiliated suspects" whose identities were unknown). Thus, probable cause to search part of an online account does not justify searching all of it. *See, e.g.*, *United States v. Mercery*, 591 F. Supp. 3d. 1369, 1380-82 (M.D. Ga. 2022) (suppressing evidence derived from warrant to search entire social media account). Similarly, the excessive time period "raises a problem." *Zelaya-Veliz*, 94 F.4th at 340; *see, e.g.*, *United States v. Lofstead*, 574 F. Supp. 3d 831, 843 (D. Nev. 2021) ("[T]here was probable cause to search . . . only in a very limited window

of time. But the Warrant did not reflect that limitation."), *appeal dismissed*, No. 21-10375 (9th Cir. Jan. 4, 2022).

The application for this manifestly excessive search was supported only by an inappropriate template, at a time by which courts had made clear their opposition to such needless intrusions on privacy. Therefore, good faith does not apply, and the district court should have granted defendants' motion to suppress. *See, e.g.*, *Burns v. United States*, 235 A.3d 758, 767 (D.C. 2020) ("The warrants' deficiencies, moreover, were so extreme and apparent that a reasonably well-trained police officer, with reasonable knowledge of what the law prohibits, would have known the warrants were invalid notwithstanding their approval by a judge.").

Finally, the district court should have granted Defendants' motion to suppress Ajayi's bank records. These records showed Ajayi's location over a period of years, violating a privacy interest that is protected by the Fourth Amendment. *See, e.g.*, *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 340-41 (4th Cir. 2021) (*en banc*). Yet, the records were obtained without a warrant, and used against Defendants at trial to show both financial transactions and physical location.

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' FREQUENT REQUESTS TO OBTAIN CRITICAL EVIDENCE FROM PROJECT HOPE.

Defendants sought (1) allegedly non-fraudulent contractor invoices, to establish that there was nothing wrong with the invoices at issue; (2) internal communications that would have shown that the upper management of Project HOPE was fully aware of how Ogunwale did business; (3) answers to what happened to Ogunwale's filing cabinet, which was lost or destroyed by Project HOPE and likely contained exculpatory evidence; and (4) evidence concerning meetings at which Ogunwale and others openly discussed using contractors at daily rates – without regard to whether the contractor actually worked the number of days on the invoice – because this methodology was necessary to compete with other aid organizations. In other words, the defense sought evidence to corroborate that Project HOPE knew paying a contractor for "daily work" actually meant paying a flat fee, and had every reason to pin the blame on Ogunwale. The district court erred in denying Defendants' motions.

## A. STANDARD OF REVIEW

A district court's ruling on a pretrial request for a subpoena *duces tecum* is typically reviewed for abuse of discretion, *see United States v. Fowler*, 932 F.2d 306, 311-312 (4th Cir. 1991), although "such discretion must be exercised carefully." *In re Grand Jury Subpoena*, 829 F.2d 1291, 1296 (4th Cir. 1987). "[A]n abuse of discretion occurs when the court uses an erroneous legal standard or bases its decision on clearly erroneous facts." *United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010).

Ogunwale's claim however, also raises a Sixth Amendment claim under the Compulsory Process Clause, and a Fifth Amendment claim under the Due Process Clause. Constitutional claims are entitled to *de novo* review. *See, e.g., United States v. Bajakajian*, 524 U.S. 321, 336 & n.10 (1998); *cf. In re Grand Jury Subpoena*, 829 F.2d at 1296 ("It is well established that a district court judge normally has considerable discretion in making findings under Fed.R.Crim.P. 17(c), at least outside the first amendment context.").

**B. UNITED STATES V. NIXON DOES NOT SET THE APPLICABLE STANDARD FOR A DEFENDANT'S SUBPOENA TO A THIRD PARTY. NIXON MEASURED A SUBPOENA BY THE PROSECUTION, NOT THE DEFENSE, AGAINST A STANDARD THAT WAS NOT INTENDED FOR SUBPOENAS TO THIRD PARTIES. UNDER THESE CIRCUMSTANCES, BROADER DISCOVERY IS CONSTITUTIONALLY REQUIRED.**

This Court has applied *United States v. Nixon* to defense-requested subpoenas *duces tecum. See, e.g.*, *Martin Marietta Corp.*, 856 F.2d at 621. The Court recently held, for the first time, that the *Nixon* standard applies to a defendant's requests to third parties. *United States v. Rand*, 835 F.3d 451, 463 (4th Cir. 2016). Defendants ask the Court to revisit the issue.

*Nixon* ruled on the propriety of a Rule 17(c) subpoena issued by the government – which does not have a Sixth Amendment compulsory process right – for documents held by another governmental agency. 418 U.S. at 687-88. It did not address a subpoena by a defendant to a third-party. As courts have observed, the *Nixon* standard is inappropriate – and even unjust – in that context.

> [A] defendant in a breach of contract case can call on the power of the courts to compel third-parties to produce any documents reasonably calculated to lead to the discovery of admissible evidence, while a defendant on trial for his life or liberty does not even have the right to obtain documents material to his defense from those same third-parties.

Applying a materiality standard . . . would resolve that puzzle at great benefit to the rights of defendants to compulsory process and at little cost to the enforcement of the criminal law.

*United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 n.1 (S.D.N.Y. 2011) (cleaned up); *see United States v. Tucker*, 249 F.R.D. 58, 64 (S.D.N.Y. 2008) ("[S]everal commentators argue that the standard is inappropriate."); *see also* JA172-1787 (arguing for revisions to Rule 17(c) to expressly authorize defendants to obtain materials, including inadmissible materials, from third parties). Indeed, the *Nixon* court expressly acknowledged that it was applying a standard ordinarily used for subpoenas from one party to another, and left open the possibility that a lower standard should be applied to third party subpoenas. 418 U.S at 699 n.12.

Furthermore, in reviewing existing law about Rule 17(c) subpoenas, *Nixon* approvingly cited *United States v. Iozia*, 13 F.R.D. 335 (S.D.N.Y. 1952). The court in *Iozia* granted a subpoena for records from a third party under circumstances similar to those in this case: the accused sought records of the "irregular practices of others, or the commission of offenses by third parties," who worked for the same company that the accused had allegedly victimized. *Id.* at 339. The

court explained: "While it is true that the irregular practices of others, or the commission of offenses by third parties, would hardly serve to exonerate this defendant of the crime charged in the indictment, inspection appears necessary for the proper preparation for trial." *Ibid*. This recognizes the important role that subpoenas *duces tecum* play for an accused preparing to defend himself at trial: they are intended to allow him to prepare for trial, not only to obtain admissible documentary exhibits.

Finally, to apply the *Nixon* standard raises serious constitutional concerns. Because *Nixon* concerned a prosecution subpoena, it did not discuss the Sixth Amendment right to compulsory process or to present a defense, and could not supersede an accused's right under that Amendment. The "essence" of the Sixth Amendment right to counsel is the right to have an attorney "investigate the case and prepare a defense for trial." *Michigan v. Harvey*, 494 U.S. 344, 348 (1990) (citing *Powell v. Alabama*, 287 U.S. 45, 58, 71 (1932)). An accused has a constitutional right to "be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "To safeguard that right, the Court has developed 'what might loosely

be called the area of constitutionally guaranteed access to evidence.'" *Ibid.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). "[C]riminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie,* 480 U.S. 39, 56 (1987). To the extent that those rights contradict the text of Rule 17(c), of course, the Constitution is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2; *see* 28 U.S.C. § 2072(b) ("Such rules shall not abridge, enlarge or modify any substantive right."); *see also, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 61 (2004) (constitutional protection is not left "to the vagaries of the rules of evidence").

## C. Even Under the *Nixon* Standard, Defendants Were Entitled to the Documents Requested.

If the *Nixon* standard does apply to this case, however, the district court nevertheless should have issued Defendants' requested subpoenas. "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710.

*Nixon* endorsed up to six factors for a district court to consider when ruling on a request for a Rule 17(c) subpoena. The *Nixon* court

identified the factors of "relevancy," "admissibility," and "specificity." *Id.* at 700. The primary case upon which *Nixon* relied, *Bowman Dairy Co. v. United States*, explained that "admissibility" was not limited strictly to documentary exhibits, or even to a defendant's affirmative case. 341 U.S. 215 (1951). The words of Rule 17(c) "must be given their ordinary meaning to carry out the purpose of establishing a more liberal policy for the production, inspection and use of materials at the trial. There was no intention to exclude from the reach of process of the defendant any material that . . . could be used at the trial." *Id.* at 220-21. Moreover, the *Bowman Dairy* court quoted a statement of the Advisory Committee on the Federal Rules of Criminal Procedure describing the Rule as "a provision ... that the court may, in the proper case, direct that [documents] be brought into court in advance of the time that they are offered in evidence, so that they may then be inspected in advance, for the purpose of course of enabling the party to see *whether he can use it or whether he wants to use it*." Id. at 220 n. 5 (emphasis added); *see also Nixon*, 418 U.S. at 699 n. 11 (quoting same).

The *Nixon* court went on to identify more factors, equally important: "that they are not otherwise procurable reasonably in

advance of trial by exercise of due diligence," as demonstrated by the futility of Ogunwale's informal requests; "that the party cannot properly prepare for trial without such production and inspection in advance of trial"; and "that the application is made in good faith and is not intended as a general 'fishing expedition.'" 418 U.S. at 699-700. And other Courts of Appeals have identified one more critical factor: balancing any "interests against" issuing the subpoena "against the defendant's right to 'investigate the case and prepare a defense for trial.'" *In re K.K.*, 756 F.3d 1169 (9th Cir. 2014) (*per curiam*) (quoting *Harvey*, 494 U.S. at 348) (denying mandamus to quash defense subpoena for victim's records).

### 1. The Requested Evidence Was Specific and Material to Preparing Defendants' Rebuttal: the Government's Case Did Not Prove a Fraud.

Fraud was an element of all the charges, concerning both Defendants' subjective intent and the nature of the act itself. *See* JA1884-1888, JA1890-1892, JA1900 (instructing jury on necessity and definition of fraudulent intentions and actions). A pillar of the government's theory was that Ogunwale defrauded Project HOPE by drafting and, through contractors, submitting invoices for work that

those contractors did not actually do. A necessary component of this theory was that inaccurate line-item descriptions on contractor invoices were fraudulent. Defendants wished to rebut that narrative by proving that Project HOPE's practice was *not* to care about line-item descriptions in contractor invoices; rather, its practice was to care only about the *time entries*, as long as contractors only billed for time actually worked. Thus, Project HOPE was complicit in the inaccuracy and necessarily was not defrauded.

To prepare their rebuttal, Defendants sought documents relevant to establishing that Project HOPE would not have considered these invoices fraudulent. Specifically, they sought evidence that Project HOPE was aware of Ogunwale's practice of approving contractor invoices based exclusively on the time entries, without concern for the accuracy of line-item descriptions; and that, because Project HOPE was complicit in the inaccurate line-item descriptions, it in fact gave him numerous *commendations* for the very work the government now alleges was fraudulent. *See, e.g.,* JA50-51 (SDT request for employment file, including commendations and lack of investigation or discipline); JA647, JA706 (arguing that Ogunwale's employee file would show

positive commendations after the offending invoices were submitted, thus tending to show that Project HOPE *endorsed* what was happening, and, ergo, was not being defrauded); JA647 (argument on employment file); JA649 (argument on lack of investigation into Ogunwale).

Ogunwale further sought documents to prove that his contractors performed work consistent with their reported time entries, even if specific work did not match line-item descriptions. *See, e.g.,* JA280-285. The district court eventually granted a narrow portion of the SDT for that purpose.

But the court continued to deny all other SDT requests. In addition to denying employee-file records, the district court denied requests for "minutes or agendas from meetings where A. Ogunwale discussed or presented capture planning strategies and pipeline updates." JA54. These concerned meetings at which Project HOPE and Ogunwale would have discussed contractor billing plans and practices, showing Project HOPE's awareness and endorsement thereof. *See* JA650-651 (argument for minutes of Ogunwale's meetings with "leadership of Project HOPE. These occurred. It happened, I'm telling

you, and at those meetings, the way it works has been discussed. And if that -- and that's critical.").

It also denied requests for examples of similar contractor invoices that were not considered to be fraudulent. *See* JA50 (requesting, in First Motion for SDT, "Five invoices from Pre-Grant-Award Contractors in Africa from before A Ogunwale's employment at Project Hope, and five such invoices from after A Ogunwale's employment at Project Hope."); JA224-225 (repeating the same in Second Motion for SDT); JA430-431 (explaining, in Fourth Motion for SDT, that "Ogunwale wishes the jury to see examples of allegedly non-fraudulent invoices to compare them to the allegedly fraudulent invoices to make the point that the allegedly non-fraudulent invoices are no more detailed or descriptive of actual work performed than the allegedly fraudulent invoices."). Defense counsel explained that these examples, which would have inaccuracies very similar to those from his contractors now claimed to be "fraudulent," would tend to prove Project HOPE's complicity in this very practice.

All of these records were relevant and material to the defense. Ogunwale gave specific explanations and descriptions of what they

were, and credibly represented (through counsel) that he had personal

knowledge of their contents because he had seen them, created them, or

been present during the events they memorialized. *See, e.g.* JA650-651,

JA647.

On this record, the district court abused its discretion by finding

the requests lacked specificity or relevance. To that end, the records

here were strikingly similar to those disclosed – which disclosure the

Court handily affirmed – in *Martin Marietta Corp.*: results of an

internal audit; interview notes; transcripts, and electronic recordings

concerning that audit; and correspondence and notes relating to an

Administrative Settlement Agreement. 856 F.2d at 622. Like the

request in *Martin Marietta,* and unlike nonspecific requests this Court

has rejected in other cases, Ogunwale's requests were not speculative

because he had personal knowledge of the materials he sought. And

they were not made merely in hope of discovering helpful information;

he articulated precisely how the information was relevant to his theory

of defense.[4]

---

[4]    *Cf., e.g., United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010)
("Caro can only speculate as to what the requested information would

Even if not an abuse of discretion under *Nixon,* the denial of these SDTs prevented Defendants from accessing significant evidence. They could not obtain these materials any other way; this situation is the precise sort in which a Rule 17(c) subpoena is necessary. Lack of access to these important materials did not only violate Rule 17(c); it violated Defendants' constitutional rights to preparation of a defense, due process of law, and compulsory process.

### 2. Defendants Were Wrongly Precluded from Using Compulsory Process to Obtain Evidence Showing Project HOPE's Own Dishonesty.

#### a. Records of Project HOPE's Misdeeds Were Critical to Prove Its Bias and Its Motive to Hide Project HOPE's Own Malfeasance by Scapegoating Defendants.

The records Ogunwale requested included documentation of previous fraud investigations (including findings of fraud), concerning

----

have shown. Moreover, his requested Rule 17(c) subpoenas cast a wide net that betokens a general fishing expedition." (quotation omitted)); *Richardson*, 607 F.3d at 368 ("Richardson is merely fishing for evidence that might support his theory, as if he were in the discovery phase of a civil action. Even on appeal, the phrasing of Richardson's argument—that "he should be allowed to discover the facts" supporting his theory that AOL and the Government were in a partnership—betrays his intention to misuse the subpoena *duces tecum* as a discovery mechanism to develop his agency claim.").

misuse of government funds (among other things) by *other* Project HOPE employees, both before and during Ogunwale's tenure. JA51-52. He listed specific reports that would reflect this fraud, including audit reports, reports prepared for the Board of Directors, employee exit interviews of persons in roles similar to Ogunwale, internal emails/memos/notes/minutes concerning an Office of Inspector General investigation over three years before Ogunwale's tenure, and other reports of fraud by other employees. JA53, JA57, JA225; *see also* JA649 (argument on Project HOPE's larger misdeeds and motive to hide them).

These materials were relevant to preparing impeachment of Project HOPE witnesses, because they went to the organization's motive to shift focus away from their own malfeasance, and onto an easy scapegoat: Ogunwale.[5] In *Martin Marietta Corp.*, this Court affirmed the issuance of a subpoena for materials (again) strikingly

---

[5] *See e.g.* JA649 (argument on Project HOPE's motive to hide its misdeeds); JA767 (argument on Project HOPE's bias); JA61 (First Motion for SDT: "The documents are relevant to the entire investigation and bias of Project Hope against Mr. Ogunwale. Each request above is relevant to the cross-examination of any Project Hope official who testifies that Ogunwale's work fell below normal Project Hope standards.").

similar to those requested here, because they were "of evidentiary value to Pollard's defense that he was made a scapegoat" by his employer. 856 F.2d at 622; *see also ibid.* ("A subpoena of the administrative agreements is at least a good faith effort to acquire evidence by Pollard for a defense that Martin Marietta hung him out to dry while protecting its own interest."). The defendant there was seeking, among other things, "interview notes, transcripts, electronic recordings and correspondence relating to the Administrative Settlement Agreement between Martin Marietta and the DOD," which sound like classic impeachment materials concerning the company's bias and motive. And in reaching its holding, this Court in *Martin Marietta* rejected an argument that the district court should have used a "narrower criminal evidentiary standard." 856 F.2d at 621. The district court erred by denying SDTs for this material.

> ### b. Defendants' Intended Uses of the Material Is Not Entirely Impeachment. Regardless, Defendants Can Use a Rule 17 Third-Party SDT to Obtain Material Impeachment Evidence.

Defendants' attack on the credibility and motivations of Project HOPE went to the heart of the government's case and, thus, was not

limited to impeachment of its witnesses. Nevertheless, insofar as the records sought would have been used for impeachment, they remain available under Rule 17(c).

As noted above, *Nixon* applied existing law from *Bowman Dairy* to reach its holding. When *Nixon* noted an "evidentiary" factor for district courts to consider when ruling on a Rule 17(c) subpoenas, the Court did *not* mean to impose a new requirement that a subpoena could only issue for the defense's affirmative case. Instead, the Court meant to continue existing practice: that admissible materials may be sought for broader evidentiary purposes. *See Bowman Dairy*, 341 U.S. at 219-220 ("That is not to say that the materials thus subpoenaed must actually be used in evidence. It is only required that a good-faith effort be made to obtain evidence."). Impeachment materials, of course, are admissible evidence. *See Nixon,* 418 U.S. at 701 ("Recorded conversations may also be admissible for the limited purpose of impeaching the credibility of any defendant who testifies or any other coconspirator who testifies."); *id.* at 711 ("The right to the production of all evidence at a criminal trial similarly has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right 'to

be confronted with the witnesses against him' . . . ."); *United States v. Moore*, 484 F. App'x 758, 766 (4th Cir. 2012) (describing "materials . . . that could potentially be used to attack the testifying inmate's credibility" as "documents that were actually relevant and admissible"); *see also, e.g.*, *Smith v. Bank of America, N.A.*, 443 F. App'x 808, 810 (4th Cir. 2011) ("[T]he evidence . . . was properly admitted as impeachment evidence.").

Furthermore, although defendants *could* admit exhibits in furtherance of confronting the government's witnesses, they are not required to do so. *Martin Marietta Corp.,* 856 F.2d at 622 ("While Rule 17(c) is limited to evidentiary materials, that is not to say that the materials subpoenaed must actually be used in evidence. It is only required that a good faith effort be made to obtain evidence."). Cross-examination through questioning alone, or even refreshing the opposing witness's recollection, is universally recognized as impeachment. Indeed, while not often referred to as such, evidence used for this purpose is technically admissible. *See United States v. Parker*, 790 F.3d 550, 558-59 (4th Cir. 2015) (holding that information "was admissible,

favorable impeachment evidence" because it could have been used for cross-examination).

Thus, Rule 17(c) applies "to such documents or objects as . , , may be used for impeachment purposes." *United States v. Carter*, 15 F.R.D. 367, 371 (D.D.C. 1954) (cited with approval in *Nixon*, 418 U.S. at 702). [6]

> **3. Many of the Requested Records Were Material Not Only to the Trial But Also to Ogunwale's Sentencing. He Should Have Been Able to Subpoena, for Presentation at Sentencing, Records of his Positive Contributions to Project HOPE and Its Constituents.**

Rule 17(c) subpoenas are not limited to the merits phase of a criminal trial. The same legal analysis applies to an SDT for information relevant to sentencing. *See, e.g., Moore*, 484 F. App'x at 766 (applying *Nixon* to subpoenas for records to be used at sentencing).

---

[6] *Carter* stated – prior to the Jencks Act – that witness statements generally need not be disclosed before trial. Thus, when the Supreme Court opined that "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial," citing to *Carter* and referring to recorded conversations, 418 U.S. at 701 it referred only to witness statements. *See United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981) (holding that statements were "simply hearsay" until a witness testified, which was not yet certain to occur, and so "may not be obtained at this time by a rule 17(c) subpoena").

Ogunwale sought records from his own employment file and other files possessed by Project HOPE, which would have shown all the *good things* he did for the organization and its constituents, as well as the isolated nature of his crime in comparison to years of productive, efficient, valuable work. His requests covered positive reviews, commendations, bonuses, and lack of any negative indicators (such as any prior investigations or reports of misconduct). *See* JA50-51, JA55-56. The government responded that it had obtained and provided to defense counsel the employment file, and a few documents falling under the category of "commendations, awards, and positive work reviews." JA239-241. The government also identified a number of audits, and internal investigative documents, pertaining to Ogunwale's work, which it had received from Project HOPE and disclosed to the defense. JA242-243. But Ogunwale pointed out, in reply, that Project HOPE had not provided the government his entire employment file, JA260, as portions had clearly been removed. JA261. Ogunwale thus continued to press his SDT for the entire file, reiterating that the SDT response should contain far more documents than what Project HOPE had given the government. JA262. Ogunwale also continued to press his SDT for

internal audit and investigative documents about himself, in order to establish that there *were* none. JA263.

Ogunwale also sought documents about grants/contracts ultimately awarded to Project HOPE as a result of his extensive hard work. The government argued that was irrelevant to its charges, JA244, but noted that it had obtained an incomplete subset of this information from Project HOPE and disclosed it to the defense. JA244. Ogunwale reiterated that these documents were incomplete; the full set was important to show his excellent work for Project HOPE. JA262-263.

The government further argued that Ogunwale's positive performance reviews would be inadmissible as "good acts" evidence under F.R.E. 404 and 405. But the defense argued the relevance and admissibility of said evidence at *sentencing,* and the government did not argue to the contrary. JA165-66, JA224.

The court denied all SDT requests for Ogunwale's employment file, finding it irrelevant to whether a fraud occurred. JA706. This decision erroneously left out a large quantity of positive sentencing evidence that Ogunwale wished to use.

### D. THE DISTRICT COURT ERRED BY DENYING A REQUEST TO ISSUE THE SDT FOR *IN CAMERA* REVIEW, AND TO PRESERVE THE APPELLATE RECORD.

Ogunwale requested that the SDTs issue for *in camera* review, by the district court and by this Court on appeal. *See* JA661; JA222; JA309. The district court erred by refusing that request.

Just as with an accused seeking access to documents held by the government, the district court should have required the SDT's issuance and held its return *in camera/under seal.* The standard in the comparable circumstance can be adopted here: when an accused makes "at least some plausible showing" of the existence, materiality, and favorable quality of the materials he seeks, they should be submitted to the trial court *in camera. Ritchie,* 480 U.S. at 60 (recognizing such a threshold right under the Due Process Clause with respect to materials in custody of prosecuting government agency); *Love v. Johnson,* 57 F.3d 1305, 1312-13 (4th Cir. 1995) (same). Only a "plausible showing" is required, because of the practical unlikelihood that an accused can show more. *See Ritchie,* 480 U.S. at 58 n. 15. Here, however, as noted *supra*, Ogunwale made more than a "plausible showing," as he had personal

knowledge of all of these things (existence, materiality, and favorable quality of the materials).

## II. THE COURT SHOULD HAVE GRANTED DEFENDANTS' MOTION TO SUPPRESS EVIDENCE DERIVED FROM WARRANTS FOR THE ENTIRETY OF THEIR GOOGLE ACCOUNTS, FROM SEVERAL YEARS BEFORE AND AFTER THE SUSPECTED CONSPIRACY.

The government suspected defendants of involvement in a conspiracy from August 2016 until May 2020, but did not limit itself to communications from this period. Instead, it sought a warrant for the full contents of their Google accounts, from November 2014 until the warrant's issuance in May 2022. That is, rather than seeking relevant communications, it sought virtually all of their online activity for a period of eight years. Many of those years were entirely outside of the suspected conspiracy.

Warrants may issue only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This warrant failed to satisfy any of those criteria. Law enforcement cannot be said to have acted in good faith in seeking a warrant of such breadth, especially given the clarity of Fourth Amendment law by the time of the warrant.

## A. THE COURT SHOULD REVIEW THE MOTION *DE NOVO*.

In ruling on an appeal of a motion to suppress, the Court "review[s] the legal conclusions de novo and the findings of fact for clear error." *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011) (quoting *United States v. Sterling,* 283 F.3d 216, 218 (4th Cir. 2002)). Here, only legal conclusions are at issue.

## B. THE UNNECESSARY BREADTH OF THE WARRANT VIOLATES THE FOURTH AMENDMENT.

The Fourth Amendment's particularity requirement was intended "to end the practice, abhorred by the colonists, of issuing general warrants. The requirement is designed to prohibit broadly phrased warrants that authorize officers to conduct exploratory rummaging in a person's belongings." *United States v. Ray*, 141 F.4th 129, 135 (4th Cir. 2025) (cleaned up). The prohibition on overbreadth similarly proscribes general searches. *See Burns*, 235 A.3d at 771 ("[T]hrough their creation of the dual constitutional mandates of probable cause and particularity, the words of the Warrant Clause are meant to deny police the ability 'to rummage at will' through a person's private matters." (citing Supreme Court authority)).

The need for specificity is particularly great in the context of digital data, which "can 'provide a single window through which almost every detail of a person's life is visible.'" *Zelaya-Veliz*, 94 F.4th at 340 (alteration omitted) (quoting *United States v. Shipp*, 392 F. Supp. 3d 300, 308 (E.D.N.Y. 2019)); *cf. Riley v. California*, 573 U.S. 373, 394-97 (2014) (emphasizing the privacy issues of searching all of a person's digital information, which "would typically expose to the government far *more* than the most exhaustive search of a house"). Therefore, a "key principle distilled from the jurisprudence in this area is that warrants . . . must describe what investigating officers believe will be found on electronic devices [or online accounts] with as much specificity as possible under the circumstances." *Wheeler v. State*, 135 A.3d 282, 304 (Del. 2016) (analyzing state and federal authority); *see United States v. Rondeau*, No. 4:23-CR-40004-KES, 2024 WL 4765007, at *6 (D.S.D. Nov. 13, 2024) (finding warrant "insufficiently particular . . . because it was not as specific as knowledge allowed" (cleaned up)); *In re Search of Google Email Accounts*, 92 F. Supp. 3d 944, 951(D. Alaska 2015) ("The answer depends on whether, given the facts of a particular case, over-seizure/over-searching can be avoided."); *People v. Carson*, — N.W.3d.

—, No. 166923, 2025 WL 2177501, at *10 (Mich. July 31, 2025) (law enforcement must "provide the most specific description possible and to support a request to search each category of data mentioned in a warrant affidavit," and magistrates may not "approve boundless searches of electronic data when the information available provides a basis for a more reasonably tailored search").

Yet, while online accounts are just as sensitive as the contents of a computer or smartphone, they pose a much lower risk of deception. It is comparatively easy to hide the contents of a personal device: one can rename files or conceal them in seemingly innocuous places. Users have far less freedom to disguise the contents of their online accounts. *See United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) ("The means of hiding evidence on a hard drive—obscure folders, misnamed files, encrypted data—are not currently possible in the context of a Facebook account."); *Shipp*, 392 F. Supp. 3d at 309 ("[T]he information associated with the account is categorized and sorted by the company—not by the user. . . . The concerns present in the search of a hard drive . . . and which necessitate broad digital search protocols do not, therefore, exist in the [account] context."). "Compared to other digital searches,

therefore, [online account] searches both (1) present a greater risk that every warrant for electronic information will become, in effect, a general warrant, and (2) are more easily limited to avoid such constitutional concerns." *Shipp*, 392 F. Supp. 3d at 309 (quotation omitted).

This case illustrates the cost of violating that constitutional principle. The application did indeed become a general warrant, for almost a decade of Defendants' lives. *See Mercery*, 591 F. Supp. 3d. at 1381 (a warrant "amounts to a general rummage of Mercery's entire Instagram account" when it "requires Instagram to disclose virtually every type of data associated with [that] account"); *United States v. Winn*, 79 F. Supp. 3d 904, 918 (S.D. Ill.) (agreeing that warrant to seize all files "invited the police to conduct an illegal general search of his cell phone"), *appeal dismissed*, No. 15-1500 (7th Cir. June 16, 2015); *Terreros v. State*, 312 A.3d 651, 666-69 (Del. 2024) (holding warrant that permitted search of all data on cell phone and had no temporal limitation to be general warrant); *see also Blake*, 868 F.3d at 974 (acknowledging the possibility that warrants requiring disclosure of an entire Facebook account "were the internet-era version of a 'general warrant'").

1. **The Warrant Sought Far-Reaching – and Often Deeply Personal – Records of Defendants' Lives with No Connection to the Alleged Conspiracy. Such a General Request Violates the Fourth Amendment.**

   *a. A Warrant to Search an Entire Google Account Is Overbroad and Insufficiently Particular When Probable Cause Is Limited to Parts of the Account and Law Enforcement Can Request a More Targeted Search.*

The government sought a warrant to search all of the data in Defendants' Google accounts. JA2614-2618. Those data included several years' worth of internet history, location data, communications with friends and family, and (often justifiably private) photos and videos. *See* JA2662-2704. Yet, the affidavit only provided a reason to search Defendants' communications with each other. *See* JA2623-2644. "[I]t was readily apparent that those messages . . . would *not* be found in [their] internet search history, photographs, or any of the many other broad categories of data included in the unlimited, template-based search authorized by the warrants." *Burns*, 235 A.3d at 776. The purported justification for the rest of the search was boilerplate language about identifying the users of the accounts, JA2644-2650, but the government already knew precisely who they were.

"The critical element in a reasonable search is . . . that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Doyle*, 650 F.3d at 471 (quoting *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 (1978)). Likewise, "[m]erely enumerating all potential search areas does not satisfy particularity." *Lofstead*, 574 F. Supp. 3d at 844. Therefore, when probable cause is limited to part of a device or account, the warrant may not authorize a search beyond that part. *See Tyson*, 781 F. Supp. 3d at 501-04 (holding warrant overbroad and insufficiently particular for authorizing search of all data on devices when officers knew what specific evidence to look for); *see also Rondeau*, 2024 WL 4765007, at *6 ("Under the present circumstances, because Officer Nelson knew the limited time frame of the offense, and the precise identity and content of the photos/videos sought, the iCloud warrant was insufficiently particular in its inclusion of all parts of an iCloud account because it was not as specific as knowledge allowed." (cleaned up)).

We are not aware of any Fourth Circuit case applying these principles to the uniquely broad circumstances of a Google account. In

the analogous (but narrower) circumstances of social media accounts, however, courts have found warrants that authorized searches beyond probable cause to be overbroad and insufficiently particular. *Mercery*, 591 F. Supp. 3d. at 1381 (invalidating as overbroad a warrant that was based on probable cause to search messages from a particular time but authorized search of entire Instagram account); *United States v. Burkhow*, No. 19-CR-59-CJW-MAR, 2020 WL 589536, at *10 (N.D. Iowa Feb. 6, 2020) ("The Court finds that permitting the search of defendant's entire Facebook account was broader than the probable cause on which the warrant was based."); *United States v. Hamilton*, No. 6:18-CR-57-REW-10, 2019 WL 4455997, at *4-5 (E.D Ky. Aug. 30, 2019) ("The United States was capable of understanding the nuances of Facebook and targeting certain categories of data but chose to seek everything possible. . . . The target was Facebook Messenger, not Hamilton's entire account."); *In re Search of Facebook Account Identified by the Username Aaron.Alexis*, 21 F. Supp. 3d 1, 7 (D.D.C. 2013) ("[T]here was certainly probable cause to search and seize items in Alexis's Facebook account . . . . The government's application, however, wholly failed to provide any explanation whatsoever for why

there was probable cause to search and seize information about third parties."); *see also Blake*, 868 F.3d at 974 (implying unconstitutionality of warrants that "required disclosure to the government of virtually every kind of data that could be found in a social media account. . . . And unnecessarily so.").

Here, the searched materials were even broader than the contents of a social media account. The intrusion on Defendants' privacy was equivalent to searching an entire smartphone, which courts have found impermissible when the probable cause is narrower, even if the seizure is limited to evidence of the suspected offense. *Lofstead*, 574 F. Supp. 3d at 838, 844 (warrant that limited search and seizure to items "pertaining to the Target Offenses" nevertheless "lacked particularity" because it "fail[ed] to delineate matters to be searched from those protected from the search"); *United States v. Opoku*, 556 F. Supp. 3d 633, 637-38, 642-43 (S.D. Tex. 2021) (even if communications on smartphone were properly tied to the crime, search of the entire phone to seize evidence of murder was unconstitutional, because "the same could not be said for 'any photographs or videos,' 'any internet history,' 'any recordings,' or 'any social media posts'"); *Carson*, 2025 WL

2177501, at *6, 8-11 (finding insufficient particularity in warrant to search phone for, and seize, "[a]ny and all records or documents[] pertaining to the investigation of Larceny in a Building and Safe Breaking"); *Burns*, 235 A.3d at 769, 774-78 (holding unconstitutional search of entire phone to seize evidence of murder). Indeed, courts have invalidated warrants for smartphones based on the extent of the search alone. *See, e.g.*, *State v. Melssen*, 2025 WI App 76, ¶¶ 48-49, — N.W.3d —, (Nov. 20, 2025) (possible relevance of some call logs and messages on smartphone did not justify search of photos, videos, search history, usernames, passwords, or bills).

Like in those cases, the government could – and, therefore, should – have limited itself to specific parts of the account that were supported by probable cause. The warrant itself

> suggests the organized nature of data associated with a [Google] account. It thus provides support for [Defendants'] contention that the search authorized by the [Google] Warrant could have been more clearly defined by its object— i.e., evidence of [fraud] in [the relevant period]—and limited to the categories of information associated with the [Google] account in which there was probable cause to believe that such evidence might be found.

*Shipp*, 392 F. Supp. 3d at 311. Thus, the warrant is invalid. Any other conclusion "would amount to a judicial greenlight for precisely the kind

of invasive governmental conduct that the Fourth Amendment was designed to prevent." *Melssen*, 2025 WI App 76, ¶ 41.

> **b. United States v. Zelaya-Veliz Is Not to the Contrary. Circumstances Permitted a Far Narrower Search and Seizure Than Was Possible in Zelaya-Veliz, and the Intensely Private Nature of the Contents Warranted Greater Protection.**

The Court has found that, in the case of a "wide-ranging" and violent conspiracy, the "sheer magnitude" of the conspiracy may justify a two-step search of an entire Facebook account. *Zelaya-Veliz*, 94 F.4th at 337-39. But its "ruling [was] a narrow one" that did "not greenlight all warrants for and searches of social media data." *Id.* at 341. Rather, "[b]ecause the particularity requirement is a pragmatic one, the degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *Id.* at 337.

Unlike in *Zelaya-Veliz*, the evidence here did not reveal that "a host of gang-affiliated suspects" were committing an unknown range of crimes. *Id.* at 338. Neither, despite the affidavit's boilerplate assertions, was there any doubt about the suspects' identities. *See id.* at 328 ("Minor-2 was unable to identify the full names of her abusers."); *id.* at

332 ("[T]here was a substantial basis to believe that all of the categories of information sought were relevant to establishing the identities of perpetrators and revealing their criminal activities."); Brief of the United States at 43, *Zelaya-Veliz*, 94 F.4th 321 (No. 22-4656) (*Zelaya-Veliz* Brief) (emphasizing need to identify all conspirators and confirm that accounts were properly identified); *see also Zelaya-Veliz* Brief at 1, 10, 21, 39, 45 (referring to conspirators' unknown identity). The need to identify an account owner may justify a warrant that would otherwise be overbroad. *See Alford*, 744 F. App'x at 652-53 (distinguishing warrant at issue from unconstitutional warrant based on need to identify the owner of the account).

In short, the government could have been far more particular here than was possible in *Zelaya-Veliz*. The warrant thus violated the "key principle" that warrant must prescribe a search "as much specificity as possible under the circumstances." *Wheeler*, 135 A.3d at 304.

Furthermore, the two-step search did not cure the problems. The list of items to be seized explicitly included items for which there was no probable cause: numerous items about identifying or locating the users, JA2619, JA2658, which (again) was not in doubt and which – based on

the reasoning of the template – could include the entire account. In any case, *Zelaya-Veliz* did not provide *carte blanche* to search limitless materials so long as the resulting seizure was limited. Courts have found two-step searches insufficient to cure a constitutional violation when the requested disclosure is unjustifiably broad, especially when the warrant does not require steps to prevent *de facto* seizure of all disclosed materials. *In re [Redacted]@gmail.com*, 62 F. Supp. 3d 1100, 1103-04 (N.D. Cal. 2014) ("[T]he problem is not with seize first, search second itself. . . . The court is nevertheless unpersuaded that the particular seize first, search second proposed here is reasonable in the Fourth Amendment sense of the word."); *Search of Facebook Account*, 21 F. Supp. 3d at 9-12 (denying warrant application); *see Blake*, 868 F.3d at 966-67, 974 (criticizing warrant that unnecessarily required disclosure of entire account, even though seizure was limited to "data that constituted fruits, evidence and instrumentalities of a specified crime" (cleaned up)); *Shipp*, 392 F. Supp. 3d at 304-05, 310-11 (criticizing warrant for breadth of search, despite limitation of seizure to evidence of firearms possession, and "not[ing] that the warrant did not set any limits on what the Government was required to do with the

information that they collected and searched, but did not 'seize'"); *cf.*

*Search of Google Email Accounts*, 92 F. Supp. 3d at 949-50 (denying

application for overbroad seizure, despite government's representation

that it would limit seizure to what was supported by probable cause,

because "the warrant would not limit its ability to *search* the entirety of

the Gmail accounts").

Finally, the intimate nature of the material sought was even

greater than of what would be found on a Facebook account. Those

materials included a range of internet activity unrelated to social

media. JA2675-2677 (showing map services, including current location;

internet history; and searches). They also included sensitive

photographs that obviously were never intended to be shared, including

financial and medical records. JA2662-2674. This "type of items

involved" warranted a greater "degree of specificity." *Zelaya-Veliz*, 94

F.4th at 337.

## 2. The Fourth Amendment Requires that Searches Be Confined to the Relevant Time Period. Yet, the Warrant Required Disclosure of Materials from Years Before Defendants' Role in the Alleged Conspiracy and Years After that Conspiracy Had Terminated.

The warrant ordered disclosure of account records from November 1, 2014, until the warrant's issuance in May 2022. That is, it permitted the government to search Ajayi's Google account for almost two years before she became involved; it similarly covered Ogunwale's account for over nine months before any suspicious emails; and it extended for another two years after the scheme terminated.

"[A] temporal limitation can help particularize warrants that authorize the search and seizure of [online] account data." *Zelaya-Veliz*, 94 F.4th at 339 (citing authority). For an online account, a temporal limitation "does not pose the administrability concerns that an analogous limitation would pose in a traditional search of a home." *Id.* at 340. The absence of such a limitation thus "raises a problem." *Ibid*. This Court has suggested that a warrant lacking a temporal limitation is invalid. *See id.* at 339-41. Other courts have unequivocally held as much. *Mercery*, 591 F. Supp. 3d at 1381 ("The compelled disclosure is not tailored to . . . the time period during which Mercery allegedly

committed the crimes."); *[Redacted]@gmail.com*, 62 F. Supp. 3d at 1104

(denying application for search warrant because the government did not

submit a date restriction); *Lofstead*, 574 F. Supp. 3d at 843 (finding

warrant to search cell phone overbroad for lack of temporal limitation,

because "there was probable cause to search for text messages . . . and

other data only in a very limited window of time"); *Winn*, 79 F. Supp. 3d

at 921 ("Most importantly, the warrant should have specified the

relevant time frame.").

It is true that, strictly speaking, there was *some* temporal

limitation. Yet, to satisfy the Fourth Amendment, the limitation must

be tied to the suspected date of the offense. *See United States v. Lazar*,

604 F.3d 230, 238 (6th Cir. 2010) ("[F]ailure to limit broad descriptive

terms by relevant dates, when such dates are available to the police,

will render a warrant overbroad." (quoting *United States v. Ford*, 184

F.3d 566, 576 (6th Cir. 1999))); *Lofstead*, 574 F. Supp. 3d at 843 ("[T]his

Court has previously found a warrant with a temporal limitation that

antedated the relevant crime period by only four days was

impermissibly overbroad." (citing authority)); *Carson*, 2025 WL

2177501, at *9 ("Put simply, when information concerning the relevant

time frame of the criminal activity exists, *this* time limitation should be included in the search warrant to ensure adequate particularity." (emphasis added)). This warrant was not so limited.

In concluding otherwise, the district court again misinterpreted *Zelaya-Veliz*, in which the Court upheld two warrants because "[t]he extensive nature of the conspiracy being investigated . . . meant that less temporal specificity was required here than in other contexts where evidence can more readily be confined to a particular time period." 94 F.4th at 340 (cleaned up). By contrast, the district court here did not "f[i]nd that the affidavits pertained to a broader criminal enterprise that encompassed criminal activity before and beyond the time period identified . . . ." *Zelaya-Veliz* Brief at 22. It could not have done so: the timeframe of the alleged conspiracy was readily ascertainable. While a temporally unlimited search might perhaps be justified under some circumstances, *see Zelaya-Veliz*, 94 F.4th at 340, "there is no justification for an unrestricted search without any temporal limitations here." *Lofstead*, 574 F. Supp. 3d at 843. The government knew precisely when each defendant joined the conspiracy and when it ended. It simply had no excuse to search or seize information beyond that time frame.

Similarly, the warrants that were upheld – for an "extensive conspiracy" that required "less temporal specificity" – extended only from six months before the earliest period of suspicion to the possible end-date of the ongoing conspiracy. 94 F.4th at 339-40. They did not cover years before and after any possible wrongdoing.

### C.  THE GOOD FAITH EXCEPTION DOES NOT APPLY TO AN UNJUSTIFIED SEARCH OF AN ENTIRE GOOGLE ACCOUNT SOUGHT ON THE BASIS OF AN INAPPOSITE TEMPLATE.

Courts have found that a "glaringly overbroad" search of data, based on an inappropriate template affidavit, is not protected by the good faith exception to the exclusionary rule. *Winn*, 79 F. Supp. 3d at 923-24; *see United States v. Oglesby*, No. 4:18-CR-0626, 2019 WL 1877228, at *4-*6 (S.D. Tex. Apr. 26, 2019) (holding good faith exception inapplicable to "bare bones" template affidavit for search of cell phone); *Burns*, 235 A.3d at 779 (holding that template affidavit, which made no effort to link information sought to suspected crime, was not protected by the good faith exception); *see also Lofstead*, 574 F. Supp. 3d at 846 ("When faced with a warrant that authorizes an unrestricted search of almost all . . . content on a cell phone, an executing officer behaving in good faith should know that such a search is objectively unreasonable

and would likely violate the defendant's Fourth Amendment rights.").

The district court nevertheless found good faith, based on *Zelaya-Veliz*.

JA637. *Zelaya-Veliz*, however, is distinguishable in two crucial respects.

### 1. The Warrant Here Was Significantly Broader than the Warrant Upheld in *Zelaya-Veliz*, Seeking More Extensive Materials Without a Comparable Justification.

First, in *Zelaya-Veliz*, the Court found good faith "[g]iven the

unsettled nature of whether a temporal limitation is required on a

warrant authorizing the search and seizure of Facebook account data."

94 F.4th at 340-41. The problems here, however, were not limited to the

timeframe.

The issues pervaded the entire warrant, which sought information

far beyond a social media account, without a similarly expansive

justification. Section II.A 1, *supra*; *see Mercery*, 591 F. Supp. 3d at 1383

(denying application of the good faith exception to a warrant that "is

broader than any social media warrant other courts have found violated

the Fourth Amendment's particularity clause but were ultimately

upheld under *Leon*"). This "astoundingly broad warrant" provided no

justification for these materials and no connection between them and

the alleged offense. *Lyles v. United States*, 910 F.3d 787, 795 (4th Cir.

2018); *see Burns*, 235 A.3d at 779 (finding no good faith in warrants to conduct similarly broad search of defendants' phone when law enforcement "prepared the warrants using the boilerplate language of a template and made no effort to tailor their scope to the facts of the case . . ."); *cf. United States v. Griffith*, 867 F.3d 1265, 1278 (D.C Cir. 2017) (finding no good faith when "[n]othing in the affidavit or warrant supported—or could have supported—probable cause to seize any and all" of the materials identified).

Therefore, "unlike the warrants in [*Zelaya-Veliz*] that . . . were a close enough question, the [Google] Warrant clearly violates the Fourth Amendment's particularity requirement." *Mercery*, 591 F. Supp. 3d. at 1383 (quotation omitted).

### 2. The Warrant Issued Years Later than the Warrant in *Zelaya-Veliz*, After Courts Nationwide Had Made Clear the Need for Greater Specificity When Possible.

Second, the warrant at issue was not sought until May 2022, almost three years after the warrant upheld under the good faith exception in *Zelaya-Veliz*. *See* 94 F.4th at 329 (second warrant, which "authorized the search of all account data going back to the accounts' respective dates of creation," was signed on June 5, 2019).

Even before the warrant in *Zelaya-Veliz*, courts across the country had expressed concerns about excessive digital warrants, although some law enforcement agencies had ignored them. *See [Redacted]@gmail.com*, 62 F. Supp. 3d at 1104 ("This is not the first time that the substance of this application has been before a magistrate judge."); *Search of Facebook Account*, 21 F. Supp. 3d at 7 (chastising the government for again seeking an overly broad search and seizure application for online account data, despite previous rejection of an application to "cast[] a remarkable dragnet over communications that surely have nothing to do with this case"). Precise location history, in particular, was already established as a subject of "special solicitude" by the Supreme Court. *Carpenter v. United States*, 585 U.S. 296, 314 (2018); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 340-41 (describing privacy interest in location information).

By May 2022, however, many more courts across the country had made clear their concerns about unlimited warrants for online accounts and about excessive digital warrants generally. *See Lofstead*, 574 F. Supp. 3d at 839 ("District courts nationwide have begun expressing concerns about over-searching ESI, especially because warrants often

authorize the government to seize large quantities of personal information that it lacks probable cause to search."); *see also Mercery*, 591 F. Supp. 3d at 1382-83 (finding no good faith in warrant for disclosure of entire Instagram account); *Opoku*, 556 F. Supp. 3d at 642-43 (finding warrant to search and seize photos, videos, internet history, and social media posts to be overbroad and insufficiently particular); *Burkhow*, 2020 WL 589536, at *10 (finding search of entire Facebook account overbroad); *Shipp*, 392 F. Supp. 3d at 311 ("Facebook warrants of the kind at issue here unnecessarily authorize precisely the type of exploratory rummaging the Fourth Amendment protects against." (quotation omitted)); *Hamilton*, 2019 WL 4455997, at *4 ("[T]he search warrants *can and should* be targeted and particular."); *Taylor v. State*, 260 A.3d 602 (Del. 2021) (holding temporally-unlimited warrant to search cell phone unconstitutional as a general warrant); *Burns*, 235 A.3d at 779; *State v. McLawhorn*, 636 S.W.3d 210, 244 (Tenn. Crim. App. 2020) (finding error in denial of motion to suppress warrant that "sought an unfettered search of all data on the Defendant's cell phone").

Officers' knowledge of the law at the time is an important consideration of the good faith analysis. *See Doyle*, 650 F.3d at 472-74

(finding good faith exception inapplicable based on law that police officers should have known); *Mercery*, 591 F. Supp. 3d at 1383 (denying good faith exception because case law from three years earlier "put law enforcement on notice that warrants authorizing the type of broad search of social media accounts like the one in this case are overbroad"); *Lofstead*, 574 F. Supp. 3d at 846 ("The search took place more than six years after the Supreme Court addressed the grave privacy concerns raised by cell phone searches in *Riley v. California.*"). Therefore, courts have rejected the good faith exception for warrants that issued after that in *Zelaya-Veliz*, and had done so even before this warrant issued. *Mercery*, 591 F. Supp. 3d at 1375 (warrant issued on November 16, 2020); *Lofstead*, 574 F. Supp. 3d at 838 (warrant issued on November 3, 2020).

### III. THE COURT SHOULD NOT HAVE ADMITTED AJAYI'S BANK RECORDS, WHICH REVEALED YEARS OF LOCATION DATA AND WERE OBTAINED WITHOUT A WARRANT.

The government obtained bank records that revealed Ajayi's location, to a specific address, from August 2016 until April 2021. Acquisition of such precise records of someone's movements, over such an extended period of time, "invades the reasonable expectation of

privacy that individuals have in the whole of their movements and therefore requires a warrant." *Leaders of a Beautiful Struggle*, 2 F.4th at 341.

### A. THE COURT SHOULD REVIEW THE MOTION *DE NOVO.*

Again, this motion to suppress only raises legal issues, which the Court reviews *de novo*. *Doyle*, 650 F.3d at 466.

### B. UNDER THE FOURTH AMENDMENT, A WARRANT IS REQUIRED TO OBTAIN RECORDS OF AJAYI'S PHYSICAL LOCATION OVER SEVERAL YEARS. THE SUPREME COURT HAS NEVER APPLIED THE THIRD-PARTY DOCTRINE TO LOCATION DATA. MOREOVER, ANY SUCH APPLICATION WOULD BE UNTENABLE IN LIGHT OF RECENT SUPREME COURT AUTHORITY.

It is clear that "an individual maintains a legitimate expectation of privacy in the record of his physical movements . . . ." *Carpenter*, 585 U.S. at 310; *see United States v. Chatrie*, 136 F.4th 100, 126 (4th Cir. 2025) (en banc) (Wynn, J., concurring) (recognizing the distinction between records of physical movement and other types of record), *cert. granted*, No. 25-112 (U.S. Jan. 16, 2026); *id.* at 144 (Berner, J., concurring) (recognizing a reasonable expectation of privacy in location history data that is traceable to a specific person); *see also United States v. Smith*, 110 F.4th 817, 834-35 (5th Cir. 2024) (considering the

application of third-party doctrine to location data and finding location data to be protected by the Fourth Amendment), *cert. denied*, 146 S. Ct. 356 (2025).

Retroactive tracking is particularly suspect. *See United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring in judgment) (opining that location monitoring became a search before four weeks); *Carpenter*, 585 U.S. at 312 ("Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years."); *cf. Smith*, 110 F.4th at 834 ("Of particular concern is the fact that a geofence will retroactively track anyone with Location History enabled."). This Court has found a Fourth Amendment violation in retrospectively monitoring someone's location for six weeks, let alone the multiple years at issue here. *Leaders of a Beautiful Struggle*, 2 F.4th at 341-42. Disclosure of a person's location history through bank records is, in many respects, similar to other methods of prolonged surveillance: bank records disclose "whether [persons] have visited a psychiatrist, plastic surgeon, abortion clinic, or AIDS treatment center [and] whether they go to gay bars or straight ones." *Carpenter*, 585 U.S. at 337 (Kennedy, J., dissenting). Furthermore, the transfer of location

through use of a bank card – a practical necessity in modern commerce – is "no more or less voluntary than the decision whether to use a cell phone." *Ibid.* (Kennedy, J., dissenting).

The district court denied Defendants' motion by misapplying the third-party doctrine articulated in *United States v. Miller*, 425 U.S. 435 (1976), which the Supreme Court has never applied to location data. Although it approved access to bank records in *Miller*, those records consisted of "all checks, deposit slips, two financial statements, and three monthly statements." *Id.* at 438. The defendant did not argue that the bank records would reveal his location, but that access to them was equivalent to a search of his private papers. *See id.* at 441-42. He could not have done otherwise: none of these documents would have indicated the petitioner's location or travels, except for the occasional visit to the bank itself. Debit cards and ATMs, which permit banks to obtain a comprehensive account of customers' movements, were not yet in widespread use.[7]

––––––––––––––––––––

[7] Even credit cards were a recent development in 1976. *See, e.g.*, Sean H. Vanatta, *Credit Card Nation*, Aeon (Apr. 22, 2024), https://aeon.co/essays/how-did-america-become-the-nation-of-credit-cards. Similarly, only a few years before *Miller*, there was not a single

Although the Supreme Court extended the third-party doctrine in *Smith v. Maryland*, this extension merely permitted law enforcement to obtain records of "the numbers dialed from the telephone at petitioner's home." 442 U.S. 735, 737 (1979). Neither *Miller* nor *Smith* addressed the government's ability to track a person's location, through financial transactions or otherwise. *See Carpenter*, 585 U.S. at 315 ("[A] detailed chronicle of a person's physical presence compiled every day, every moment, over several years . . . implicates privacy concerns far beyond those considered in *Smith* and *Miller*"); *see also Chatrie*, 136 F.4th at 116 (Wynn, J., concurring) (describing records in *Smith* and *Miller* as "relatively unrevealing").

To the extent that *Miller* has previously been read as applying to location information, such a reading has been overruled by *Carpenter* and its progeny. *See Jones*, 565 U.S. at 416-17 (Sotomayor, J., concurring) (describing framework later adopted in *Carpenter*, for which "it may be

---

ATM in the United States. *See First U.S. ATM Opens for Business*, History.com, https://www.history.com/this-day-in-history/september-2/first-atm-opens-for-business (last updated May 28, 2025); Kevin Wack & Alan Kline, *The Evolution of the ATM*, American Banker (May 23, 2017), www.americanbanker.com/slideshow/the-evolution-of-the-atm.

necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties"); *Chatrie*, 136 F.4th at 119 (Wynn, J., concurring) ("While building on all that came before it, *Carpenter* marked a sea change in Fourth Amendment jurisprudence as it pertains to a person's digital information." (quotations omitted)); *id.* at 125 (Wynn, J., concurring) ("But *Carpenter* rejected that simplistic, outdated approach because it failed to contend with the seismic shifts in digital technology that made detailed location tracking possible." (cleaned up)).

### C. Introduction of the Bank Records at Trial, Including to Prove Ms. Ajayi's Location, was Prejudicial to Both Defendants.

The government made extensive use of Ajayi's bank records at trial. Without them, it would have struggled to prove that she received any money from her supposed fraud. The bank records also showed transactions with Ogunwale that the government implied were kickbacks. This encouraged the jury to suspect the motives of both defendants.

And the government indeed used the records to prove her location. Specifically, it introduced Ajayi's transactions in the United States at a

time when invoices described her as meeting with an unspecified embassy. JA1140-1143. Defense counsel attempted to undermine the insinuation of fraud, by suggesting that she had actually met with the Nigerian consulate in Atlanta. JA1222-1223. Nevertheless, the implication that an invoice was false supported the first link in the government's chain of reasoning: the invoices were false; so, Ajayi must have known they were false; so, she must have intentionally submitted false invoices; so, she must have intended to defraud Project HOPE. Although there are flaws in this chain, a jury may nevertheless have accepted it.

Therefore, the wrongly-introduced bank records could very well have changed the outcome of trial.

## CONCLUSION

Defendants request that the Court reverse their convictions and remand their case to the district court, with instructions to grant their motions for subpoenas *duces tecum* and motions to suppress.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on the issues raised in this appeal.

Respectfully Submitted,

/s/ Jonathan Knowles
Jonathan Knowles
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC
(347) 273-1828
Jonathan@BurnhamGorokhov.com

*Attorney for Defendant-Appellant
Abimbola Ajayi*


By: */s/ Christopher Leibig*
Christopher Leibig
LAW OFFICES OF CHRISTOPHER LEIBIG
421 King Street #505
Alexandria, VA 22314
(703) 683-4310 (phone)
(703) 574-1497 (fax)
Chris@chrisleibiglaw.com

*Attorney for Defendant-Appellant
Abiodun Ogunwale*

# CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*12,933*] words.

[    ] this brief uses a monospaced type and contains [state the number of] lines of text.

This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2021*] in [*14pt Century Schoolbook*]; or

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 22, 2026</u>           <u>/s/ Jonathan Knowles</u>
                                          *Counsel for Appellant*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of January, 2026, I caused the redacted version of this Opening Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel for the United States of America, Plaintiff-Appellee, at the following address:

LAUREN N. BEEBE
lauren.beebe@usdoj.gov

DANIEL J. HONOLD
daniel.honold@usdoj.gov

KATHLEEN E. ROBESON
kathleen.robeson@usdoj.gov

KIMBERLY M. SHARTAR
kimberly.m.shartar@usdoj.gov

Assistant United States Attorneys
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

I further certify that on this 22nd day of January, 2026, with prior written consent, I served the unredacted version of Appellant's Opening Brief and the Sealed Joint Appendix on Lauren Beebe, Kathleen Robeson and Kimberly Shartar by email to the above addresses.