NOS. 25-4523, 25-4536

# United States Court of Appeals

*for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

ABIMBOLA AJAYI, a/k/a Abbi Ajayi,
ABIODUN OGUNWALE, a/k/a Abbey Ogunwale,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA, IN CASE NOS. 1:24-cr-00165-MSN-2 AND 1:24-cr-00165-MSN-1, HONORABLE MICHAEL STEFAN NACHMANOFF, U.S. DISTRICT COURT JUDGE

## APPELLANTS' REPLY BRIEF


JONATHAN M. KNOWLES
BURNHAM & GOROKHOV, PLLC
1634 I Street, NW, Suite 575
Washington, DC 20006
(347) 273-1828
jonathan@burnhamgorokhov.com

*Attorney for Defendant-Appellant Abimbola Ajayi*

CHRISTOPHER LEIBIG
LAW OFFICE OF CHRISTOPHER LEIBIG
421 King Street, Suite 505
Alexandria, Virginia 22314
(703) 683-4310
chris@chrisleibiglaw.com

*Attorney for Defendant-Appellant Abiodun Ogunwale*



COUNSEL PRESS (800) 4-APPEAL • (131854)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

I. THE DISTRICT COURT'S ERRORS WERE NOT HARMLESS .......... 1

II. THE DISTRICT COURT ERRED IN DENYING THE DEFENDANTS' SPECIFIC REQUESTS TO SUBPOENA RELEVANT AND ADMISSIBLE DOCUMENTS FROM PROJECT HOPE .......... 4

A. The Court Should Review the District Court's Decisions *de Novo* .......... 4

B. Non-Fraudulent Invoices, Which Would Have Fatally Undermined the Government's Theory of the Case, Were Relevant and Admissible .......... 4

C. The Defendants Made Specific Requests for Other Relevant Documents .......... 10

D. The Documents Were Sought for Non-Impeachment Use. Regardless, the District Court Should Have Issued a Subpoena for Any Documents that Would Certainly Be Admissible to Impeach a Witness, and Should Have Reviewed Other Impeachment Material *in Camera* .......... 13

III. THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' MOTION TO SUPPRESS THE EVIDENCE DERIVED FROM THEIR GOOGLE ACCOUNTS .......... 17

A. The Warrants Were Overbroad and Insufficiently Particular, Twice Over. Neither the Material Searched, Nor the Time Frame, Was Sufficiently Described or Bounded by Probable Cause .......... 17

1. The Material Seized Was Not Limited by Probable Cause But, Even If It Had Been, This Court Has Recognized That the Two-Step Search Process Does Not Protect an Overbroad Search of an Online Account ........ 17

2. Searches of Online Accounts Must Be Limited to Time Periods for Which There is Probable Cause. This Search Was Not ........ 21

3. Neither Was This Search Limited to Data Supported by Probable Cause ........ 25

B. The Good Faith Exception Does Not Apply ........ 27

C. The Severance Doctrine Does Not Apply to a Warrant That Is Entirely Permeated by Invalidity. There Are No Valid Portions to Sever ........ 30

IV. AJAYI'S BANK RECORDS CONTAINING LOCATION DATA SHOULD NOT HAVE BEEN ADMITTED. NO COURT HAS HELD OTHERWISE ........ 33

CERTIFICATE OF COMPLIANCE ........ 34

CERTIFICATE OF FILING AND SERVICE ........ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Maryland*,
427 U.S. 463 (1976) ........ 24

*Burns v. United States*,
235 A.3d 758 (D.C. 2020) ........ 32

*In re Grand Jury, John Doe No. G.J. 2005-2*,
478 F.3d 581 (4th Cir. 2007) ........ 4

*In re Martin Marietta Corp.*,
856 F.2d 619 (4th Cir. 1988) ........ 8, 11, 13

*Massachusetts v. Sheppard*,
468 U.S. 981 (1984) ........ 29

*Morris v. Wachovia Sec., Inc.*,
448 F.3d 268 (4th Cir. 2006) ........ 4

*Ornelas v. United States*,
517 U.S. 690 (1996) ........ 23

*People v. Carson*,
— N.W.3d. —, No. 166923, 2025 WL 2177501
(Mich. July 31, 2025), *cert. denied*, No. 25-5939 (Jan. 12, 2026) ........ 22

*Richardson v. State*,
282 A.3d 98 (Md. 2022) ........ 22, 28, 32

*Smith v. Maryland*,
442 U.S. 735 (1979) ........ 33

*State v. Correa*,
341 A.3d 910 (Conn. 2025) ........ 30, 32

*State v. McLawhorn*,
636 S.W.3d 210 (Tenn. Crim. App. 2020) ........ 27

*United States v. Aboshady*,
951 F.3d 1 (1st Cir. 2020) ........ 25

*United States v. Alford*,
744 F. App'x 650 (11th Cir. 2018)........................................................25

*United States v. Arditti*,
955 F.2d 331 (5th Cir. 1992).................................................................7

*United States v. Belcher*,
No. 7:23-cr-00045, 2023 WL 8936756
(W.D. Va. Dec. 27, 2023).................................................................8, 12

*United States v. Blake*,
868 F.3d 960 (11th Cir. 2017)................................................. 19, 20, 28

*United States v. Blakeney*,
949 F.3d 851 (4th Cir. 2020)...........................................................17-18

*United States v. Carter*,
15 F.R.D. 367 (D.C. Cir. 1954)...................................................... 14, 16

*United States v. Castro*,
881 F.3d 961 (4th Cir. 2018)......................................................... 19, 31

*United States v. Cobb*,
970 F.3d 319 (4th Cir. 2020).......................................... 17, 19, 29, 31

*United States v. Cuthbertson*,
651 F.2d 189 (3d Cir. 1981) ..............................................................14

*United States v. Daprato*,
2:21-cr-00015-JDL-4, 2022 WL 1303110 (D. Me. May 2, 2022).........26

*United States v. Fitzsimmons*,
342 F.R.D. 18 (D.D.C. 2022) ............................................................15

*United States v. Hang*,
75 F.3d 1275 (8th Cir. 1996)...............................................................7

*United States v. Kamara*,
No. 1:23-cr-149 (RDA), 2023 WL 8357946
(E.D. Va. Dec. 1, 2023).......................................................................19

*United States v. King*,
194 F.R.D. 569 (E.D. Va. 2000) ............................................... 9, 12, 15

*United States v. Lalor*,
996 F.2d 1578 (4th Cir. 1993) .......... 28

*United States v. LaRouche Campaign*,
841 F.2d 1176 (1st Cir. 1988) .......... 16

*United States v. Lazar*,
604 F.3d 230 (6th Cir. 2010) .......... 22

*United States v. Lester*,
No. 1:17-00195, 2018 WL 3060036
(S.D. W. Va. June 19, 2018) .......... 15

*United States v. Libby*,
432 F. Supp. 2d 26 (D.D.C. 2006) .......... 15

*United States v. Liburd*,
17-CR-296 (PKC), 2018 WL 2709199 (E.D.N.Y. June 5, 2018) .......... 26

*United States v. Lofstead*,
574 F. Supp. 3d 831 (D. Nev. 2021), *appeal dismissed*,
No. 21-10375 (9th Cir. Jan. 4, 2022) .......... 22, 30, 32

*United States v. McCall*,
84 F.4th 1317 (11th Cir. 2023), *cert. denied*,
144 S. Ct. 1042 (2024) .......... 28

*United States v. McLamb*,
880 F.3d 685 (4th Cir. 2018) .......... 29, 30

*United States v. Miller*,
425 U.S. 435 (1976) .......... 33

*United States v. Morris*,
287 F.3d 985 (10th Cir. 2002) .......... 13

*United States v. Morris*,
794 F. Supp. 3d 384 (D.S.C. 2025) .......... 6, 8, 14

*United States v. Naum*,
134 F.4th 234 (4th Cir.), *cert. denied*, No. 25-5117
(U.S. Oct. 6, 2025) .......... 1-2

*United States v. Newby*,
251 F.R.D. 188 (E.D.N.C. 2008) .......... 9, 12, 13, 14

*United States v. Nixon*,
418 U.S. 683 (1974) .......... 6, 14

*United States v. Poulin*,
671 F. Supp. 2d 822 (E.D. Va. 2009) .......... 22

*United States v. Reyes*,
239 F.R.D. 591 (N.D. Cal. 2006) .......... 16

*United States v. Robinson*,
68 F.4th 1340 (D.C. Cir. 2023) .......... 3

*United States v. Russian*,
848 F.3d 1239 (10th Cir. 2017) .......... 19

*United States v. Sells*,
463 F.3d 1148 (10th Cir. 2006) .......... 30, 31

*United States v. Shipp*,
392 F. Supp. 3d 300 (E.D.N.Y. 2019) .......... 19, 20, 28

*United States v. Silverman*,
745 F.2d 1386 (11th Cir. 1984) .......... 8, 11-12, 15

*United States v. Skinner*,
3:19cr19, 2021 WL 1725543 (E.D. Va. Apr. 29, 2021) .......... 20, 25, 29

*United States v. Stevenson*,
727 F.3d 826 (8th Cir. 2013) .......... 7

*United States v. Turner*,
No. 3:24-cr-00008, 2025 WL 1062511 (W.D. Va. Apr. 8, 2025) .......... 15

*United States v. Tyson*,
781 F. Supp. 3d 483 (E.D. Va.), *reconsideration denied*,
779 F. Supp. 3d 741 (E.D. Va. 2025) .......... 18, 19

*United States v. Underwood*,
No. 0:19-cr-00420-JMC-1, 2019 WL 5078351
(D.S.C. Oct. 10, 2019) .......... 6, 7

*United States v. Westley*,
No. 3:17-CR-171 (MPS), 2018 WL 3448161
(D. Conn. July 17, 2018) .......... 26

*United States v. Williams*,
592 F.3d 511 (4th Cir. 2010) ........ 19

*United States v. Winn*,
79 F. Supp. 3d 904 (S.D. Ill.), *appeal dismissed*,
No. 15-1500 (7th Cir. June 16, 2015) ........ 29, 30

*United States v. Young*,
260 F. Supp. 3d 530 (E.D. Va. 2017), *aff'd*, 916 F.3d 368
(4th Cir. 2019) ........ 19, 21, 25

*United States v. Zelaya-Veliz*,
94 F.4th 321 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024) ....... *passim*

*Wilson v. Murray*,
806 F.2d 1232 (4th Cir. 1986) ........ 2

**Statutes and Other Authorities:**

U.S. Const., Amend IV ........ 23

U.S. Const., Amend VI ........ 4

Fed. R. App. P. 32(f) ........ 34

Fed. R. Crim. P. 17(c) ........ 7

## I. THE DISTRICT COURT'S ERRORS WERE NOT HARMLESS.

The government (rightly) does not argue that the denial of Defendants' motions to suppress was harmless error. It does argue that the district court's other errors were harmless.

The Court has been deprived of the ability to review any of the materials sought because the district court, without explanation, denied Defendants' request to order production for the appellate record. JA222, JA309, JA661; *see* Opening Br. 38 (Jan. 22, 2026). In a case like this, where Ogunwale proffered his personal knowledge that exculpatory documents existed and the district court refused to place them under seal for appellate review, that error mandates reversal. The documents (particularly valid invoices) plainly existed, and the district court did not find the requests to be cumbersome or a "fishing expedition," but instead denied the request by arbitrarily dismissing the proposed defense. That refusal to allow development of the appellate record should at least defeat harmless error review. The government should not benefit from its own opposition to such development. In any case, the inadequate record prevents the government from meeting its burden to show harmlessness. *See United States v. Naum*, 134 F.4th 234, 240-41 (4th

Cir.) ("[T]he court asks whether the error is harmless because it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. . . . [T]he government bears the burden on harmless error review."), *cert. denied*, No. 25-5117 (U.S. Oct. 6, 2025); *Wilson v. Murray*, 806 F.2d 1232, 1238 (4th Cir. 1986) ("[T]he government bears the burden of proving beyond a reasonable doubt that evidence admitted under constitutional error was harmless.").

Insofar as this record permits review, the government's argument is transparently wrong as to the subpoena for non-fraudulent invoices, which would have entirely demolished the government's case. Section II.B, *infra*. Its analysis of the remaining errors fails upon close examination. Numerous unfavorable admissions were extracted at trial from government witnesses. *See* Opening Br. 10 (citing JA1935-37, testimony therein, and JA1325-1335). In short, those witnesses had ample reason not to know of Defendants' work for Project HOPE: they had no role in pre-positioning or capture (JA959); Ogunwale worked privately with consultants (JA945, JA993, JA1052-1053, JA1068-1070, JA1217-1219, JA1576-1577, JA1762, JA1764; *see* JA1332-1333); Ajayi lived in Nigeria for much of her time at Project HOPE, as was common

for consultants (JA1219-1220, JA1576); and pre-positioning work often left no written records (JA919-920, JA1060-1061, JA1575-1576, JA1728-1729). Even so, it was indisputable that Ajayi had performed at least some work for Project HOPE. *See* JA1762-1763. Project HOPE was also revealed as potentially dishonest: it may not have complied with its own policies (JA1621-1622, JA1675), and it potentially withheld or destroyed evidence (JA900, JA1255, JA1581, JA1627-1628).[1] Dayo Fasola also provided a potentially innocent explanation of Defendants' transactions: they exchanged money to avoid banks' higher rates. JA1938 (citing JA1824-1826, JA1831-1834).

"Since it would have taken only one juror harboring a doubt to change the result," in the face of these concessions, the government cannot show beyond a reasonable doubt that evidence further undermining Project HOPE's credibility would not have changed the outcome of the trial. *United States v. Robinson*, 68 F.4th 1340, 1348 (D.C. Cir. 2023) (applying analogous standard).

---

[1] Laura Brye's testimony leaves no doubt that, in fact, Project HOPE withheld evidence. JA1918, JA2063. Given the timing of this unexpected revelation, defense counsel were unable to incorporate it into their trial strategy. JA2065-2067.

## II. THE DISTRICT COURT ERRED IN DENYING THE DEFENDANTS' SPECIFIC REQUESTS TO SUBPOENA RELEVANT AND ADMISSIBLE DOCUMENTS FROM PROJECT HOPE.

### A. THE COURT SHOULD REVIEW THE DISTRICT COURT'S DECISIONS *DE NOVO*.

The Court typically reviews the denial of a Rule 17 subpoena for abuse of discretion. *See, e.g.*, *In re Grand Jury, John Doe No. G.J. 2005-2*, 478 F.3d 581, 584 (4th Cir. 2007). "A district court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Ibid.* (quoting *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006)). As Defendants also raise a Sixth Amendment Compulsory Process issue here, however, *de novo* review is appropriate.

### B. NON-FRAUDULENT INVOICES, WHICH WOULD HAVE FATALLY UNDERMINED THE GOVERNMENT'S THEORY OF THE CASE, WERE RELEVANT AND ADMISSIBLE.

Defendants repeatedly sought examples of Project HOPE invoices that were concededly not fraudulent. *See* JA51, JA56, JA224-225, JA430. As we explained in our Opening Brief (25-26, 28-29), such documents were certainly relevant. The government's essential theory at trial was that line entries in the invoices showed billing for work that was not performed. As it says in its own response, in litigating the

subpoenas below, it argued that "the fraudulent invoices . . . listed specific tasks that Ajayi did not in fact do." Resp. Br. 21 (May 5, 2026); *see* JA759 (the government "would say these invoices were for specific things that were not done."); *see also* JA449 (arguing that other invoices "do[] not make it any more or less likely that defendant Ajayi performed the work that was invoiced"). But any inaccuracies would be irrelevant if Defendants believed that the invoices were not expected to reflect the work for which they had been paid. *See, e.g.*, JA658 (arguing that Project HOPE "allowed accounting practices and invoices filed at the end of the day that are . . . not always exactly what happened, but they knew they were getting the value," so "even if the invoice says things that aren't right, he's still not guilty"). Shoddy recordkeeping, without more, is not fraud.

The government now suggests that those invoices were not relevant because it did not introduce them at trial. As Defendants anticipated, however, it did introduce testimony that "Project Hope witnesses(es) who worked on proposals named in those invoices do [not] know the consultant at issue or remember any work that person performed." JA431; *see* JA871, JA961, JA972, JA1036-1039. All of that

testimony presupposed that descriptions on Project HOPE invoices were accurate. Defendants could have undermined that testimony – and the government's entire case – by showing that they were not: "the same thing is true of the invoices which are not alleged to be fraudulent." JA431.

These documents were also sufficiently described. Contrary to the government's argument, specificity does not require a line-by-line description. *See United States v. Nixon*, 418 U.S. 683, 700 (1974) ("Of course, the contents of the subpoenaed tapes could not at that stage be described fully . . . but there was a sufficient likelihood that each of the tapes contains conversations relevant to the offenses charged in the indictment."); *see also, e.g.*, *United States v. Morris*, 794 F. Supp. 3d 384, 395 (D.S.C. 2025) (issuing subpoena that is "sufficiently tailored as it requests a single document," even where defendant could only argue that a witness' actions "may be in contravention of" that document); *cf. United States v. Underwood*, No. 0:19-cr-00420-JMC-1, 2019 WL 5078351, at *3 (D.S.C. Oct. 10, 2019) (finding insufficiently specific a request for "all written or electronic communication . . . pertaining to the State charges against [suspects the defendant had arrested]"

(emphasis omitted)). The government quotes *dictum* that Rule 17(c) "'require more than the title of a document and conjecture as to its contents." Resp. Br. 22 (quoting *Underwood*, 2019 WL 5078351, at *3). This language comes from a chain of out-of-circuit opinions, none of which denied access to a specific and narrow range of relevant documents purely because the movant could not describe their contents with exactitude. *See United States v. Stevenson*, 727 F.3d 826, 832 (8th Cir. 2013) (documents sought were not relevant unless they showed particular requests by law enforcement, but the defendant "does not identify a specific agreement that supposedly reveals such requests, and he offers only conjecture about what such a document might contain"); *United States v. Hang*, 75 F.3d 1275, 1283 (8th Cir. 1996) (defendant made a "broad request" for a range of documents that might support groundless accusations against witnesses, "even though the defense was admittedly 'hard-pressed' to describe the information it hoped to discover in the materials"); *United States v. Arditti*, 955 F.2d 331, 345-46 (5th Cir. 1992) (defendant sought a wide range of documents "including those showing the 'nature, goals and targets of [the IRS'] operation," which "border[ed] on a fishing expedition").

Here, the defendants identified a few specific documents – which certainly existed[2] – and how they would use the contents of those documents. Courts typically grant requests of such specificity, and often of far less. See *In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988) (affirming finding that "that the requested materials[ – ]results of an internal audit, interview notes, transcripts, electronic recordings and correspondence relating to the Administrative Settlement Agreement between Martin Marietta and the DOD[ – ]were described with sufficient specificity"); *United States v. Silverman*, 745 F.2d 1386, 1396-97 (11th Cir. 1984) (affirming grant of subpoena "for complaints made against [the defendant] by his former clients or The Florida Bar"); *Morris*, 794 F. Supp. 3d at 394-95 (denying motion to quash "any bwc footage related to this incident as well as any polices or procedures LCSO may have regarding the use of bwc"); *United States v. Belcher*, No. 7:23-cr-00045, 2023 WL 8936756, at *1, *4 (W.D. Va. Dec. 27, 2023)

---

[2] Setting aside Ogunwale's knowledge, the government's own theory assumed the existence of these invoices. If Project HOPE lacked even five non-fraudulent invoices, it cannot have relied on invoices for information about the tasks that contractors had performed. If it failed to return the requested documents, contrary to the understanding of all involved, the government's case would have been devastated.

(finding sufficiently specific a request that "generally seeks records 'that may help bolster a possible alibi or may provide an entirely different alibi,'" because it "seeks records from specific sources during a confined time-frame that directly relate to his alibi"); *United States v. Newby*, 251 F.R.D. 188, 190 (E.D.N.C. 2008) ("The request to subpoena . . . the written standard operating procedures for the New Bern Police Department's vice narcotics unit from 2006 until the present is GRANTED to the extent that [they] exist."); *United States v. King*, 194 F.R.D. 569, 575 (E.D. Va. 2000) ("The subpoena specifically requests the unedited recordings, and the interview notes, of the Gauldin interview, as well as any other recordings of statements by or conversations with other known or potential witnesses to this case.").

The government also claims that Defendants never raised their appellate arguments below. That claim is nonsense: Defendants argue on appeal that the comparator invoices "would have inaccuracies very similar to those from his contractors now claimed to be 'fraudulent.'" Opening Br. 28. We have just quoted that argument. *Supra* at 5-6 (quoting JA431, JA658). Defendants made clear below that they needed the invoices to show that inaccurate task descriptions did not indicate a

failure to perform the work for which they were paid. *See* JA647-648 ("And then someone's going to testify, As far as we can tell, that wasn't done, right? . . . I should be able to say, Can you show me one that was done right so that we can compare it to what you're saying so that we can then see?"); JA658 ("I'm saying that they allowed accounting practices and invoices filed at the end of the day that are per day, they're vague, they're not always exactly what happened, but they knew they were getting the value."); JA685 ("[P]art of the government's evidence . . . is going to be the idea that the work wasn't done."). But the district court simply refused to countenance any defense other than "[h]ere were the invoices, and the work was done." JA692; see *ibid.* ("If Project HOPE has documents that support the idea that *this* work was performed, he should be able to get them." (emphasis added)).

### C. THE DEFENDANTS MADE SPECIFIC REQUESTS FOR OTHER RELEVANT DOCUMENTS.

The government dismisses, as insufficiently specific, Defendants' requests for "internal communications that would have shown that the upper management of Project HOPE was fully aware of how Ogunwale did business." Resp. Br. 22 (quoting Opening Br. 18). But Defendants' points were not confined to the opening paragraph of their Argument

section. That one-sentence summary, devoid of context, did not capture the details of Defendants' requests below or their arguments on appeal. *See* Opening Br. 26-29, 30-31 (citing JA50-54, JA 57, JA 225, JA706).

Even if their request for Ogunwale's entire employment file were considered overbroad, Defendants more specifically requested performance evaluations for Ogunwale, as well as records of investigations into him. JA50-52. They also requested minutes and agendas from meetings discussing his capture work. JA54. Defendants' specific requests on other fraud included documented investigations, allegations of misconduct, reports to the Board of Directors, audit reports, and documentation relating to an investigation by the Office of the Inspector General. JA51-53, JA57. In addition to showing Project HOPE's knowledge of Ogunwale's business practices, these documents would also demonstrate its motive to scapegoat him and Ajayi. *See Martin Marietta*, 856 F.2d at 622 ("They are of evidentiary value to Pollard's defense that he was made a scapegoat.").

Any one of these categories is as specific as the request upheld in *Martin Marietta*. *See* 856 F.2d at 621; *see also Silverman*, 745 F.2d at

1396; *Belcher*, 2023 WL 8936756, at *1; *Newby*, 251 F.R.D. at 190; *King*, 194 F.R.D. at 575.

The government cites no authority that, after the district court denied these requests, Defendants were obliged to repeat them. Regardless, they did repeat many, including specific requests for commendations and incidents of alleged fraud. JA224-25.

Finally, the government argues that certain documents were not available because Ogunwale himself destroyed them. But the only cited proof that Ogunwale "*presumably* cleaned out the filing cabinet in question," JA1981 (emphasis added), is an email that he was "working on [emptying his] office." JA2048. That email says nothing about the fate of the filing cabinet or (more importantly) its contents, which may have been stored elsewhere at Project HOPE. It is hardly surprising that, five years later, Ogunwale could not remember precisely what was done with those contents. And, at the hearing, the district court made no factual finding that Ogunwale had destroyed the laptop. Indeed, the only evidence that the government now cites was presented at trial. *See* JA951-952, JA2179. This case is thus very different from one in which the defendant sought records of aggressive action that may never have

occurred, in an employment file that he had never seen. *United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002).

Neither is there any invited error: if the documents no longer existed, Project HOPE could have simply responded that it could not locate them, as it did to the subpoena that was issued. *See* JA379-380 ("Project Hope first stated that it could not locate any documents for Mr. Ogunwale's request number 5."); *see also* JA705 ("And if there are no documents, then there are no documents."); *Newby*, 251 F.R.D. at 190 (granting subpoena "to the extent that [the documents] exist").

### D. THE DOCUMENTS WERE SOUGHT FOR NON-IMPEACHMENT USE. REGARDLESS, THE DISTRICT COURT SHOULD HAVE ISSUED A SUBPOENA FOR ANY DOCUMENTS THAT WOULD CERTAINLY BE ADMISSIBLE TO IMPEACH A WITNESS, AND SHOULD HAVE REVIEWED OTHER IMPEACHMENT MATERIAL *IN CAMERA*.

The evidentiary uses sought extend far beyond impeachment. Opening Br. 32-33; *see Martin Marietta*, 856 F.2d at 622 (affirming subpoena for defense that the defendant's employer "hung him out to dry while protecting its own interest"). Even for pure impeachment purposes, however, disclosure by subpoena would be permissible (and necessary).

The government argues that "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." Resp. Br. 25 (quoting *Nixon*, 418 U.S. at 701). That language, read in its original context, refers to witness statements. Opening Br. 35 n.6. Other types of evidence may be obtained by subpoena for impeachment purposes. *See Morris*, 794 F. Supp. 3d at 394-95 (issuing subpoena for body-worn camera policy, which bore on the credibility of a possible witness); *Newby*, 251 F.R.D. at 190 (issuing subpoena for written standard operating procedures, which "could be relevant as impeachment evidence . . . at trial").

Even if the general disfavor towards pre-trial disclosure extends to other impeachment evidence, however, this case falls within a specific exception. That disfavor is based on the potential for inadmissibility if a given witness does not testify. *See, e.g.*, *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981) (holding that, unless a witness testified, statements were "simply hearsay" so "may not be obtained at this time by a rule 17(c) subpoena"); *United States v. Carter*, 15 F.R.D. 367, 371 (D.C. Cir. 1954) (cited with approval in *Nixon*, 418 U.S. at 701-02) ("There is no reason, however, why such a

statement should be examined in advance of the trial, since the witness may not eventually be called to testify.”).

In this case, there was no such possibility. It was always clear that the government would introduce witnesses from Project HOPE, and that – regardless of the particular witnesses – the sought evidence could be used to impeach their testimony. When evidence will certainly be admissible for impeachment, because the defendant “seeks materials related to one . . . who this Court has no doubt will serve as a pivotal witness for the government,” it can be obtained by a subpoena. *United States v. Turner*, No. 3:24-cr-00008, 2025 WL 1062511, at *3 (W.D. Va. Apr. 8, 2025) (quotation and alteration omitted) (citing *United States v. Lester*, No. 1:17-00195, 2018 WL 3060036, at *7 (S.D. W. Va. June 19, 2018)); *see Silverman*, 745 F.2d at 1397 (“Rule 17 plainly authorized the subpoena and its enforcement after [the defendant] announced that he would take the stand . . . .”); *United States v. Fitzsimmons*, 342 F.R.D. 18, 21 (D.D.C. 2022) (“[W]hen a person is almost certain to testify as a witness at trial and there is an indication of what that testimony will be, then pre-trial production is appropriate.” (quoting *United States v. Libby*, 432 F. Supp. 2d 26, 37-38 (D.D.C. 2006)); *King*, 194 F.R.D. at 574

("[W]here it is known with certainty before trial that the witness will be called to testify, the admissibility determination . . . can be made before trial, and the statements properly may be considered evidentiary." (citing *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988)).

At the least, the material should have been produced *in camera*, so that it could be disclosed if it became admissible. *See United States v. Reyes*, 239 F.R.D. 591, 601 (N.D. Cal. 2006) ("[S]everal courts have ordered the items produced for *in camera* inspection so that the court may review the material and disclose it, if ever, when it becomes ripe for impeachment." (citing three decisions by circuit courts)). "Fairness and justice obviously require this course." *Carter*, 15 F.R.D. at 371 (ordering disclosure at trial of materials relevant to witnesses who testified).

### III. THE DISTRICT COURT ERRED IN DENYING DEFENDANTS' MOTION TO SUPPRESS THE EVIDENCE DERIVED FROM THEIR GOOGLE ACCOUNTS.

#### A. THE WARRANTS WERE OVERBROAD AND INSUFFICIENTLY PARTICULAR, TWICE OVER. NEITHER THE MATERIAL SEARCHED, NOR THE TIME FRAME, WAS SUFFICIENTLY DESCRIBED OR BOUNDED BY PROBABLE CAUSE.

##### 1. The Material Seized Was Not Limited by Probable Cause But, Even If It Had Been, This Court Has Recognized That the Two-Step Search Process Does Not Protect an Overbroad Search of an Online Account.

The government places much stock in the two-step search process as mitigating any harm from an overly-broad disclosure of materials to be searched. Here, however, the material to be *seized* was excessive: it included all "evidence of the identification or location of the user(s) of the Account." JA2619, JA2658. Even the government argues that this provision includes information and images that are not otherwise related to the crime. *See* Resp. Br. 41-42 (arguing that all potentially identifying information is supported by probable cause); Section III.A.3, *infra* (explaining why it is not). And specifying the relevant offense can provide sufficient particularity, "at least sometimes," only "where a warrant does not *otherwise* describe the evidence to be seized." *United States v. Cobb*, 970 F.3d 319, 328 (4th Cir. 2020) (quoting *United States*

*v. Blakeney*, 949 F.3d 851, 862-63 (4th Cir. 2020)). Filtering the material to be seized cannot cure invalidity when the filtering criteria expressly permit an unconstitutional seizure.

Moreover, even if the seizure had been properly limited, the warrant would still be invalid. "Courts have found two-step searches insufficient to cure a constitutional violation when the requested disclosure is unjustifiably broad, especially when the warrant does not require steps to prevent *de facto* seizure of all disclosed materials." Opening Br. 51 (citing authority). This Court has already held that, in the context of an online account, excessive breadth or insufficient particularity "raises a problem," despite a two-step search. *United States v. Zelaya-Veliz*, 94 F.4th 321, 340 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024); *see also United States v. Tyson*, 781 F. Supp. 3d 483, 502-04 (E.D. Va.) (applying Fourth Circuit law to hold that review of every file was not permissible when "law enforcement knew exactly what they were searching for," so "it would have been both practical and prudent for the detectives to limit their search"), *reconsideration denied*, 779 F. Supp. 3d 741 (E.D. Va. 2025).

In arguing otherwise, the government relies extensively on caselaw relating to searches of personal devices or physical media. *See Cobb*, 970 F.3d at 324 (laptop computer); *United States v. Castro*, 881 F.3d 961, 964 (4th Cir. 2018) (cell phones); *United States v. Williams*, 592 F.3d 511, 516 (4th Cir. 2010) ("several computers, CDs, DVDs, and other electronic media devices"); *United States v. Russian*, 848 F.3d 1239, 1242-43 (10th Cir. 2017) (two cell phones); *United States v. Kamara*, No. 1:23-cr-149 (RDA), 2023 WL 8357946, at *2-3 (E.D. Va. Dec. 1, 2023) (iPhone); *United States v. Young*, 260 F. Supp. 3d 530, 539-40 (E.D. Va. 2017) (physical records), *aff'd*, 916 F.3d 368 (4th Cir. 2019). *But see Tyson*, 781 F. Supp. 3d at 504 (requiring law enforcement to limit their search, even of a phone, when doing so was "practical and prudent" because they "knew exactly what they were searching for").

This caselaw is inapposite, because "[t]he means of hiding evidence on a hard drive [or in a physical cabinet] are not currently possible in the context of a[n online] account." *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017); *see United States v. Shipp*, 392 F. Supp. 3d 300, 309 (E.D.N.Y. 2019) ("[T]here is no possibility that a user could have filed an incriminating photo as a 'poke,' and there is no

chance that an incriminating message will be stored as a third-party password or a rejected friend request."); *cf. Zelaya-Veliz*, 94 F.4th at 340 ("[I]t is possible for Facebook to filter data . . . before disclosing it to the government.").

*United States v. Skinner*, while superficially closer, is distinguishable in two important respects. No. 3:19cr19, 2021 WL 1725543 (E.D. Va. Apr. 29, 2021). First, unlike here, "an initial time-limited search could not occur." *Id.* at *18. There was "uncontroverted evidence" that law enforcement "could not separate data by date." *Ibid.* Second, the warrant was narrower: the material to be searched was limited to communications, associated records, and direct evidence of child pornography and kidnapping (including related travel); and the material to be seized was limited to a ten-month period that began when the defendant met his victim. *See id.* at *3, *5-7.

Thus, Defendants' caselaw is more on point. *See Blake*, 868 F.3d at 974 ("We are not convinced that the cases . . . which involve seizing an entire hard drive located in the defendant's home and then later searching it at the government's offices, are applicable in the social media account context."); *Shipp*, 392 F. Supp. 3d at 310 ("Moreover,

although the Facebook Warrant only permitted the government to *seize* ‘evidence of a violation . . . since January 1, 2018,’ the government was permitted to *search* the entire Facebook account since its creation.”). This Court has already recognized that a higher standard applies in the online context, finding a “problem” with an overly-broad search of a Facebook account, despite a more limited seizure. *Zelaya-Veliz*, 94 F.4th at 340.

#### 2. Searches of Online Accounts Must Be Limited to Time Periods for Which There is Probable Cause. This Search Was Not.

The warrant sought data from years after and, in Ajayi’s case, years before the conspiracy. Because this time period far exceeds any probable cause, the warrant is invalid. *See* Opening Br. 53-55 (citing authority).

Rather oddly, the government argues that *Zelaya-Veliz* controls this case while denying its clear import: that a temporal limitation is typically required in a warrant to search an online account. *See* 94 F.4th at 340. Instead, the government asserts that no temporal limitation is required, based on clearly distinguishable case law addressing physical searches. *See Young*, 260 F. Supp. 3d at 550 (ruling

on Attachment A to the Residence Warrant); *United States v. Poulin*, 671 F. Supp. 2d 822, 825 (E.D. Va. 2009) ("The warrant authorized the search of Defendant's medical office and the seizure of patient files . . . for [patients] treated between 2006 and 2008."). But an online search must be limited temporally – for initial disclosures as well as for seizures – precisely "because it is possible for [the service provider] to filter data by time frame before disclosing it to the government, while an officer searching a home often has no idea when each item was last used." *Zelaya-Veliz*, 94 F.4th at 340.

That temporal limitation must be tied to probable cause. Opening Br. 53-54 (citing *United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010); *United States v. Lofstead*, 574 F. Supp. 3d 831, 843 (D. Nev. 2021), *appeal dismissed*, No. 21-10375 (9th Cir. Jan. 4, 2022); *People v. Carson*, — N.W.3d. —, No. 166923, 2025 WL 2177501, at *9 (Mich. July 31, 2025), *cert. denied*, No. 25-5939 (Jan. 12, 2026)); *see also Richardson v. State*, 282 A.3d 98, 123 (Md. 2022) (requiring "a *reasonable* temporal restriction" (emphasis added)); *cf. Poulin*, 671 F. Supp. 2d at 825-26 (recognizing probable cause because search was linked to time of offence). Any other conclusion would permit evasion of the Fourth

Amendment simply through the choice of an arbitrary time period. Indeed, since the account's duration of existence necessarily sets the outer bounds of the search, if *any* time limit were sufficient there would be no need for the warrant to include a shorter one. Although there may be probable cause for a period beyond the known dates of the offense (or even, in so-far-unforeseen circumstances, for a period without any limitation) there is no justification to search for years beyond a conspiracy that is clearly delimited. Opening Br. 55-56; *cf. Zelaya-Veliz*, 94 F.4th at 339-40 (upholding disclosure from, at most, six months before start date of only known crime in broad and still ongoing conspiracy).

In the absence of any caselaw supporting its position, the government must speculate that a broader search might somehow turn up useful evidence. The standard is not *conceivable* cause, however. It is *probable* cause. *See Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("We have described . . . probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."). The government argues: Ajayi might have had a secret bank account that Project HOPE inexplicably paid money into without

knowing about; law enforcement needed to examine years of behavior that was not criminal to recognize behavior that was, but also there was no non-criminal behavior, because Defendants might have been planning to commit a crime that entire time (even after they cut ties with Project HOPE); Defendants might have maintained incriminating evidence for years, then decided much later to delete it (but, through unspecified means, left evidence of doing so); law enforcement could not identify Defendants from communications during the time period (even though identity is not at issue, Section III.A.3, *infra*); and Ajayi might actually have done the work, but only before or after her time at Project HOPE (although the government itself states that probable cause applies to "evidence that will aid in" – not undermine – "apprehension or conviction." Resp. Br. 39 (quoting *Anderson v. Maryland*, 427 U.S. 463, 483 (1976)). The warrant application contained no evidence to support the government's imaginings.[3] Had some been found, law enforcement could have sought a second warrant.

---

[3] The application did establish probable cause, albeit for a far shorter time period, to believe that Defendants actually performed the work. Even so, the government should not be able to expand probable cause by claiming to search a person's own records for proof of innocence.

### 3. Neither Was This Search Limited to Data Supported by Probable Cause.

One would think it beyond dispute that the bounds of a search must be limited by probable cause. Nevertheless, the government disputes it.

The government argues, in effect, that one suspected of a crime has no privacy right in any internet data. It has precious little support for this argument. In *Alford*, identification of the account owner was truly necessary, because "[t]he only information . . . was a phone call to K-Mart from an anonymous Google Voice phone number." 744 F. App'x 650, 653 (11th Cir. 2018). Likewise, in *Young* – which, once again, addressed physical records – the defendant had taken extensive measures to conceal his communications with coconspirators. *See* 260 F. Supp. 3d at 550. *Skinner* addressed cell phone contents that were directly relevant to the defendant's preparations for kidnapping and child pornography offenses. 2021 WL 1725543, at *12. *Aboshady* did not even involve particularity or overbreadth, but only whether the government had retained evidence for too long and complied with the warrant. 951 F.3d 1, 6-8 (1st Cir. 2020).

The closest cases are three unpublished, out-of-circuit decisions permitting broad seizures of Facebook accounts. Aside from being questionable in their own right, those decisions are not persuasive here. Facebook accounts are dedicated entirely to communications with third parties. *See United States v. Daprato*, 2:21-cr-00015-JDL-4, 2022 WL 1303110, at *5 (D. Me. May 2, 2022) (explaining why communications were relevant); *United States v. Liburd*, 17-CR-296 (PKC), 2018 WL 2709199, at *2 (E.D.N.Y. June 5, 2018) (same); *see also United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 WL 3448161, at *10-11 (D. Conn. July 17, 2018) (listing communications and related information). Yet, the very problem is that the government went far beyond communications. *See* JA2662-2704 (excerpts from warrant returns).

Finally, the government deigns to address the affidavit at issue, arguing that it might have shown a need to identify the account owners. But that affidavit contains no averment that Ajayi ever tried to disguise her identity, or any support for the government's assertion that Ogunwale set up a Gmail account in Adeoye's name. Resp. Br. 42 (citing JA53). Furthermore, Defendants were tied to these accounts by name and financial transactions, and could be further linked to them after the

search through relevant communications and subscriber information. *See* JA2627, JA2630-2634, JA2636-2637 (Ogunwale received money at accounts linked to Gmail account); JA2640 (Ajayi used Gmail account to open PayPal account); *see also* JA2678 (Ajayi's subscriber information). Ogunwale's Gmail address had already permitted identification of a supposedly fraudulent PayPal account. JA2631. It was apparent that irrelevant communications, photographs, or other personal information would not reveal anything of value.

### B. The Good Faith Exception Does Not Apply.

A warrant of such astonishing overbreadth can only reflect a deliberate choice to treat Defendants' entire lives as fair game. There was simply no justification, other than speculative boilerplate, to access the entirety of Defendants' Google accounts for eight years. This decision cannot be considered "the result of negligence rather than systemic error or reckless disregard of constitutional requirements." *State v. McLawhorn*, 636 S.W.3d 210, 245 (Tenn. Crim. App. 2020) (quotation and alteration omitted) (unlimited search of cell phone); *see* Opening Br. 56-57 (citing authority that such a search is not protected by the good faith exception).

The government argues that courts have found good faith in comparable situations. But, as with *Zelaya-Veliz*, those cases were distinguishable in two ways. *See* Opening Br. 57-61. First, the warrants issued earlier, before the caselaw requiring precision had been as clearly established. *See United States v. McCall*, 84 F.4th 1317, 1320-21 (11th Cir. 2023) (in April 2020), *cert. denied*, 144 S. Ct. 1042 (2024); *Blake*, 868 F.3d at 966 (well before 2017); *Shipp*, 392 F. Supp. 3d at 303 (on February 8, 2019); *Richardson*, 282 A.3d at 107 (on October 12, 2018). Second, contrary to the government's argument, the warrant at issue was actually broader than in those cases. *Richardson* involved a single device. 282 A.3d at 106-08. *Blake* and *Shipp* involved Facebook accounts, which are limited to communications and related data, rather than Google accounts including a bevy of information for private use. *See Blake*, 868 F.3d at 966-67; *Shipp*, 392 F. Supp. 3d at 304-05. The iCloud account at issue in *McCall* was also primarily communications and, moreover, "stored data for only a two-and-a-half-month period at the time of the search." 84 F.4th at 1328; *see id.* at 1325-26. Insofar as *Lalor* is even relevant, the search took place days – not years – after the crime had ceased. 996 F.2d 1578, 1582 (4th Cir. 1993).

Neither does review by a prosecutor fix the problem. The record does not reveal the extent of that review, let alone any meaningful (or even meaningless) prior consultation. *See United States v. Winn*, 79 F. Supp. 3d 904, 923 (S.D. Ill.) (holding good faith absent when the prosecutor's "review of the complaint and search warrant template was quick and cursory"), *appeal dismissed*, No. 15-1500 (7th Cir. June 16, 2015); *see also Cobb*, 970 F.3d at 335, 342 (Floyd, J., dissenting) (weighing testimony to find suppression warranted because the attorney's role "could generously be characterized as minimal"); *cf. Cobb*, 970 F.3d at 323-25 (considering detailed account of warrant history before finding adequate consultation); *United States v. McLamb*, 880 F.3d 685, 689 (4th Cir. 2018) (describing consultation with multiple attorneys); *Skinner*, 2021 WL 1725543, at *18 ("[T]his record shows that the FBI agent who executed the warrant sought legal advice before start[ing]." (citing hearing transcript)). Neither is there any record that a magistrate provided "the strong reassurances . . . present in [*Massachusetts v.*] *Sheppard*." *Cobb*, 970 F.3d at 342 (Floyd, J., dissenting); *see Sheppard*, 468 U.S. 981, 989-90 (1984) (describing magistrate's repeated and explicit assurances that the officer's concerns

were unfounded); *see also Winn*, 79 F. Supp. 3d at 923-24 (considering thoroughness of magistrate's review). Furthermore, "the legality of [the] investigative technique" was not "unclear". *McLamb*, 880 F.3d at 691. Rather, numerous courts had made clear that precision is required in searching an online account.

### C. THE SEVERANCE DOCTRINE DOES NOT APPLY TO A WARRANT THAT IS ENTIRELY PERMEATED BY INVALIDITY. THERE ARE NO VALID PORTIONS TO SEVER.

The government's argument for severance betrays a fundamental misunderstanding of the doctrine. Severance is not a means to rewrite an invalid warrant as if it had always been valid. *See State v. Correa*, 341 A.3d 910, 929 (Conn. 2025) (interpreting doctrine derived from federal law) ("[T]he severance doctrine authorizes a trial court only to salvage a constitutional remainder, not to make an insufficiently particular warrant particular."). Therefore, the hypothetical sufficiency of a narrower application "does not mean that the severance doctrine is *automatically* applicable." *United States v. Sells*, 463 F.3d 1148, 1158 (10th Cir. 2006); *see Lofstead*, 574 F. Supp. 3d at 848 ("When law enforcement has information that would enable more targeted searches, severance should not be used as a post facto remedy to rewrite overbroad warrants.").

Rather, "every court to adopt the severance doctrine has further limited its application to prohibit severance from saving a warrant that has been rendered a general warrant . . . despite containing some valid portion." *Sells*, 463 F.3d at 1158. The doctrine "is only applicable if the valid portions of the warrant are sufficiently particularized, distinguishable from the invalid portions, and make up the greater part of the warrant." *Id.* at 1155 (quotation and alteration omitted). Thus, this Court has consistently applied the doctrine to sever "invalid section[s] [that] appear[] at the end of the operative sentence and can be severed without changing the meaning of the valid sections of the warrant." *Castro*, 881 F.3d at 966; *see Cobb*, 970 F.3d at 331 ("[T]he challenged phrase '[a]ny and all evidence of any other crimes' in the warrant before us, while overbroad in isolation, was easily and properly severed . . . ."); *see also Cobb* at 330-31 (citing cases involving "the general tail of a search warrant," "broad boilerplate language authorizing seizure of every conceivable item," and a particular request that was severable from the rest of the warrant).

By contrast, the invalid portions made up not merely "the greater part of [this] warrant," but the entirety of it. *Sells*, 463 F.3d at 1155.

Every clause was directed to the entire account for an insupportable time frame. Severance cannot rescue such a warrant, which has no particularized or distinguishable portions to sever. *See Lofstead*, 574 F. Supp. 3d at 847-48 (declining to extend the doctrine by permitting *ex post facto* temporal limitation when "the portions of the Warrant which are supported by probable cause are not 'textually severable' from those which are not"); *Correa*, 341 A.3d at 929 ("[T]he court did not 'sever' a portion of the warrant at all. Rather, it did the opposite and added a new aspect to the warrant to create a temporal limitation when none existed originally."); *Burns v. United States*, 235 A.3d 758, 780 (D.C. 2020) (holding federal severance doctrine inapplicable to warrants for search of entire cell phones, which "had no valid portions that could be properly severed under any construction of the severability doctrine"); *Richardson*, 282 A.3d at 123 n.17 (when warrant permitted search of entire cell phone, "severing the catchall language . . . would not cure the particularity problem").

## IV. AJAYI'S BANK RECORDS CONTAINING LOCATION DATA SHOULD NOT HAVE BEEN ADMITTED. NO COURT HAS HELD OTHERWISE.

The government's arguments for admission of Ajayi's bank records, both as to its constitutionality and as to good faith, rest on the same flawed assumption: that the analysis was controlled by the Supreme Court's third-party doctrine. As we argued in our Opening Brief, at 64-66, the Supreme Court has never applied that doctrine to records of debit card transactions, or to any other indication of location history. *See Smith v. Maryland*, 442 U.S. 735, 737 (1979) (calls from telephone at home); *United States v. Miller*, 425 U.S. 435, 438 (1976) (financial statements and records of transactions performed at bank). Thus, there is no controlling precedent on point.


Jonathan M. Knowles
Burnham & Gorokhov, PLLC
1634 I Street, NW, Suite 575
Washington, DC 20006
(347) 273-1828
jonathan@burnhamgorokhov.com
*Attorney for Defendant-Appellant Abimbola Ajayi*

Christopher Leibig
Law Office of Christopher Leibig
421 King Street, Suite 505
Alexandria, Virginia 22314
(703) 683-4310
chris@chrisleibiglaw.com
*Attorney for Defendant-Appellant Abiodun Ogunwale*

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [6,491] words.

[ ] this brief uses a monospaced type and contains [state the number of] lines of text.

This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2021*] in [*14pt Century Schoolbook*]; or

[ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: March 30, 2026

/s/ Jonathan Knowles
*Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 30th day of March, 2026, I caused this Reply Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to counsel for the United States of America, Appellee.

Dated: March 30, 2026

/s/ Jonathan Knowles
*Counsel for Appellant*